# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

JOHN ESTERHAY,

        Plaintiff,

        v.

TEN OAKS MANAGEMENT, LLC; ASTECH
HOLDINGS, LLC; AEP LEGACY, INC., formerly
known as ASTECH Engineered Products, Inc.;
ANDREW LOVROVICH; DAVID RICHESON; and
JOHN DOES 1-20;

        Defendants.

Case No. 3:23-cv-00203-KDB-DCK

## AMENDED COMPLAINT AND JURY DEMAND

Jared E. Gardner (N.C. Bar No. 28275)
Mark S. Pincus (N.C. Bar No. 59036)
GARDNER SKELTON PLLC
505 East Boulevard
Charlotte, North Carolina 28203
Telephone: (704) 335-0350
Facsimile: (704) 390-7027
jared@gardnerskelton.com
mark@gardnerskelton.com
*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

I.    DEFENDANTS MISLEAD PLAINTIFF INTO ACCEPTING THE CEO POSITION WITH ASTECH..........................................................................................................4

      A.    Defendants Recruit Plaintiff to become ASTECH'S Chief Executive Officer .......4

      B.    At a Town Hall Meeting with ASTECH's Employees, Defendants Falsely Represent the Nature of Defendants' Acquisition of and Intentions for ASTECH, Seeking to Induce ASTECH's Former Employees to Rejoin the Restructured Company and to Induce Plaintiff to Accept the CEO Position.............................10

      C.    After Accepting the CEO Position at ASTECH, Plaintiff Learns the Truth about Ten Oak's Acquisition of ASTECH and its Intentions for ASTECH ...................15

            a.    Rather than Investing their Own Money, Ten Oaks Was Paid About $7 Million To Take ASTECH.........................................................................17

            b.    Ten Oaks Took Control of ASTECH as a "Service" to Help Melrose Divest an Unwanted Investment ...............................................................18

            c.    Ten Oaks Intentionally Does Little or No Due Diligence on the Companies It Acquires, Including ASTECH...............................................19

            d.    Among the Reasons Melrose Wanted GKN to Dispose of ASTECH was an Unprofitable Contract with Boeing.......................................................20

            e.    Defendants Knew Melrose's Payment Was Intended to Compensate Ten Oaks for Potential Liabilities Associated with Owning ASTECH, Including the Risk that GKN Would Not Renew ASTECH's Lease.........21

            f.    Ten Oaks Charges Management Fees Retroactively ................................24

            g.    Ten Oaks Misused the Term "Family Office" To Deceive .......................24

            h.    Defendants Misled Plaintiff About Ten Oaks' Intent to Obtain Financing for ASTECH ......................................................................................25

II.   DEFENDANTS TERMINATED PLAINTIFF FROM THE CEO POSITION AT ASTECH AFTER HE REFUSED TO PARTICIPATE IN AND COMPLAINED ABOUT THEIR ONGOING FRAUD AGAINST BOEING ...........................................28

      A.    While Serving as ASTECH'S CEO, Plaintiff Learns that Defendants Misled Boeing into Approving Defendants' Acquisition Of ASTECH ...........................28

      B.    Defendants Attempt to Force Price Increases on Boeing ......................................32

ii

C.     Plaintiff Refuses to Join Defendants in Misrepresenting Facts at the May 25, 2022 Meeting with Boeing ................................................................................. 39

      a.     Defendants Falsely Told Boeing Ten Oaks Had Invested and Would Continue Invest In ASTECH, Which Was Untrue Because Ten Oaks Actually Had Received $7 Million to Take ASTECH and Had No Plans To Invest ................................................................................. 40

      b.     Defendants Misrepresented to Boeing That ASTECH Would Apply For Financing ................................................................................. 43

      c.     Defendants Misled Boeing On Risks Related To ASTECH's Lease Renewal ................................................................................. 44

      d.     Defendants Deceived Boeing About Ten Oaks' Planned Short Holding Period ................................................................................. 46

      e.     Defendants Deceived Boeing About Ten Oaks' Management Fee Charged Retroactively ................................................................................. 47

      f.     Defendants Misrepresented the Relevance of Defendant Lovrovich's Experience ................................................................................. 48

D.     Defendants Retaliated Against Plaintiff for Complaining about and Refusing to Support or Participate in Misrepresentations, Deceit and Unlawful Conduct ....... 50

FIRST CAUSE OF ACTION ................................................................................. 54

SECOND CAUSE OF ACTION ................................................................................. 55

THIRD CAUSE OF ACTION ................................................................................. 56

FOURTH CAUSE OF ACTION ................................................................................. 57

FIFTH CAUSE OF ACTION ................................................................................. 59

SIXTH CAUSE OF ACTION ................................................................................. 60

SEVENTH CAUSE OF ACTION ................................................................................. 62

PRAYER FOR RELIEF ................................................................................. 64

Case 3:23-cv-00203-KDB-DCK    Document 15    Filed 07/10/23    Page 3 of 67

Plaintiff John Esterhay, by his attorneys Gardner Skelton PLLC, alleges for his Complaint against Ten Oaks Management, LLC ("Ten Oaks"); ASTECH Holdings, LLC ("Astech HoldCo."); AEP Legacy, Inc., formerly known as ASTECH Engineered Products, Inc. ("ASTECH"); Andrew Lovrovich; David Richeson; and John Does 1-20, as follows:

## NATURE OF THE CASE

1.      This case arises from (a) Defendants' fraudulent inducement of Plaintiff to become CEO of ASTECH; and (b) their retaliatory termination of Plaintiff from his position after he complained about and refused to participate in fraudulent statements to and activities concerning Boeing, a major ASTECH client.

## PARTIES

2.      Plaintiff John Esterhay is a natural person domiciled in Charlottesville, Virginia and therefore is a citizen of Virginia.

3.      Defendant Ten Oaks Management, LLC is a limited liability company organized under Delaware law with its principal place of business in Charlotte, North Carolina.  To the best of Plaintiff's knowledge, Ten Oaks has four members, who are domiciled as follows:  John Curtis Griner (North Carolina), Michael Hahn (California), Andrew Lovrovich (Washington), and Matthew Magan (North Carolina).  Ten Oaks therefore is a citizen of California, North Carolina, and Washington.  Ten Oaks directly controls Defendant ASTECH Holdings, LLC and ASTECH and holds itself out as ASTECH Holdings, LLC's Manager.

4.      Defendant ASTECH Holdings, LLC ("Astech HoldCo") is a limited liability company organized under Delaware law with a principal place of business in Santa Ana, California.  To the best of Plaintiff's knowledge, ASTECH Holdings, LLC has five members, who are domiciled as follows:  John Curtis Griner (North Carolina), Michael Hahn (California),

1

Andrew Lovrovich (Washington), Matthew Magan (North Carolina), and David P. Richeson (North Carolina). Astech HoldCo therefore is a citizen of California, North Carolina, and Washington. Astech HoldCo's purpose is to shield Ten Oaks and its partners from liability associated with ASTECH and which controls ASTECH as agent and/or alter ego of Ten Oaks.

5. Defendant AEP Legacy, Inc., formerly known as ASTECH Engineered Products, Inc. ("ASTECH") is a Delaware corporation with its principal place of business in Santa Ana, California. ASTECH was not named in the original Complaint in this case because it is the subject of a bankruptcy proceeding in the Bankruptcy Court for the District of Delaware, titled *In re ASTECH Engineered Products, Inc.*, Case No. 1:22-bk-10635 ("ASTECH Bankruptcy Case"). By order dated July 6, 2023, the court in the ASTECH Bankruptcy Case modified the terms of the bankruptcy stay so that ASTECH could become a Defendant in the above-captioned case with the caveat that any recovery against ASTECH "shall be solely from applicable insurance proceeds and/or providers." *In re ASTECH Engineered Products, Inc.*, Case No. 1:22-bk-10635, ECF No. 487 (July 6, 2023).

6. Defendant Andrew Lovrovich is a natural person domiciled in Seattle, Washington and is therefore a citizen of Washington.

7. Defendant David Richeson is a natural person domiciled in Waxhaw, North Carolina and is therefore a citizen of North Carolina.

8. Defendants John Does 1-20, fictitiously named herein, are the other persons affiliated with Defendants who either were sufficiently involved in the creation of the fraudulent misstatements made to Plaintiff or the retaliatory decision to terminate Plaintiff's employment.

***Joint Employer***

2

9. Plaintiff is informed and believes, and thereon alleges that, at all times mentioned herein, that the named Defendants, and Does 1 through 20, and each of them, were acting as the agent and/or employee of each other Defendant, and were acting within the course and scope of said principal-agency and/or employment relationship, and directed, authorized and/or ratified the conduct set forth in detail in this Complaint. Plaintiff is further informed, believes, and thereon alleges that, each of the fictitiously named defendants are responsible in some manner for the acts and omissions herein alleged and that the damages sustained by Plaintiff, as herein alleged, were proximately caused by Defendants, and each of them.

10. Plaintiff is informed and believes, and thereon alleges that, Defendants were at all relevant times the joint employers of Plaintiff as they exercised joint control and/or right to assign work, working conditions, maintained joint authority to terminate Plaintiff, supervised and controlled his work environment and schedule, managed his work methods, and determined the rate and method of payment.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(a)(1) because (a) there is complete diversity of citizenship among the parties, such that neither Plaintiff is a citizen of the same state as Defendant and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. Venue is proper in the Western District of North Carolina. Plaintiff signed a Protective Covenants agreement with Ten Oaks providing that "[a]ny action arising from or relating to this Agreement shall be brought exclusively in a state or federal court sitting in Charlotte, North Carolina." Additionally, Plaintiff signed a Term Sheet with Astech HoldCo providing that "[a]ny action arising from or relating to this Agreement shall be brought

3

exclusively in a state or federal court sitting in Charlotte, North Carolina." Further, venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant Richeson resides in the Western District of North Carolina and Ten Oaks maintains its principal place of business there.

**FACTS**

**I. DEFENDANTS MISLEAD PLAINTIFF INTO ACCEPTING THE CEO POSITION WITH ASTECH**

    **A.    Defendants Recruit Plaintiff to become ASTECH'S Chief Executive Officer**

13. Plaintiff is an accomplished business executive with over 20 years of cumulative experience in general management, private equity, management consulting, and active-duty military service. Plaintiff's business experience spans a wide range of industries, including aerospace and defense manufacturing and supply chain management.

14. ASTECH is a supplier of all-welded honeycomb metallic aerostructures to the global aerospace and defense industry. ASTECH designs and manufactures a product line of aircraft engine inlet and exhaust structures, including engine exhaust nozzles, plugs, flaps, and other specialized parts for Original Equipment Manufacturers ("OEMs") of commercial and military aircraft, naval vessels, missiles, and other platforms. ASTECH is the sole source supplier for many specialized parts required by many aerospace and defense OEMs to produce certain models of commercial and military aircraft, naval vessels, missiles, and other platforms, and to perform maintenance and make repairs necessary to maintain the same in-service, pursuant to safety requirements and other standards, rules, and regulations established by the U.S. Federal Aviation Administration and other governing organizations.

15. Upon information and belief, ASTECH was acquired in about May 2002 by business entities owned by GKN Ltd ("GKN Aerospace" or "GKN"), a British multinational aerospace manufacturing company.

4

16. In or about April 2018, GKN was acquired by Melrose Industries PLC ("Melrose"), a British manufacturing company based in London, United Kingdom that buys, invests in manufacturing companies in aerospace, automotive, powder metallurgy, and other industries.

17. Upon information and belief, Ten Oaks closed a transaction with Melrose on or about March 11, 2022, whereby defendant Ten Oaks acquired ASTECH from Melrose via GKN Aerospace's divesture of ASTECH to a portfolio company of defendant Ten Oaks. Through the transaction, Ten Oaks acquired the assets of ASTECH, along with certain liabilities, and assumed all of ASTECH's customer contracts from Melrose (GKN), including its sales contract to supply parts to The Boeing Company ("Boeing").

18. In February 2022, before the acquisition of ASTECH, Ten Oaks told Plaintiff that it was pursuing a transaction for Ten Oaks to acquire ASTECH from Melrose via the divesture of ASTECH from GKN to Ten Oaks.

19. Ten Oaks provided Plaintiff a copy of a business presentation, dated February 10, 2022, entitled "Introduction to Ten Oaks Group," which Ten Oaks stated that Ten Oaks had presented to Boeing on February 10, 2022 to get Boeing comfortable with Ten Oaks acquiring ASTECH.

20. On February 22, 2022, Defendant Lovrovich told Plaintiff that if Ten Oaks acquired ASTECH, Ten Oaks would hire a Chief Executive Officer to lead ASTECH and wanted to know if Plaintiff was interested. Plaintiff expressed potential interest in the employment opportunity, subject to learning more about Ten Oaks and its plans for ASTECH, and subject to reaching an agreement on compensation and other employment terms. Thereafter, Ten Oaks

5

(through Defendant Lovrovich, and Defendant Richeson) proceeded to recruit Plaintiff to accept the role.

21. Subsequently, on March 1, 2022, Defendants Richeson and Lovrovich spoke separately with Plaintiff by telephone to recruit Plaintiff for the role.

22. Again, on March 8, 2022, Defendant Lovrovich spoke with Plaintiff to recruit plaintiff for the role. Over the telephone, Defendant Lovrovich explained to Plaintiff the elements of a written "Term Sheet" offer that Defendant Lovrovich had prepared and said he would be emailing to Plaintiff. During their discussion, Defendant Lovrovich explained to Plaintiff that the Term Sheet offer was conditioned upon if and when Ten Oaks might "close the sale" of ASTECH. Defendant Lovrovich explained that negotiations with Melrose over the "closing price" were challenging and that many issues were involved – including certain environmental liabilities, certain customer claims related to defective product quality, ASTECH's facility lease renewal, and written consent from Boeing – but that Ten Oaks anticipated "closing the sale."

23. On March 10, 2022, at or about 6:46 am Pacific Time, Defendant Lovrovich sent Plaintiff a text message, stating in pertinent part: "Hey Jack – Just confirmed the *closing price* with GKN and we are looking to close this week" (emphasis added).

24. Based on the above, Plaintiff formed an objectively reasonable belief that Ten Oaks had reached a definitive agreement with Melrose (GKN) to make a *bona fide* monetary investment (the "closing price") to acquire ASTECH from Melrose (GKN). Plaintiff replied by text message to Defendant Lovrovich, stating: "Andrew, that's really great news! Should we plan to talk tomorrow after the close?"

6

25. On March 11, 2022 at or about 8:50 am Pacific time, Defendant Lovrovich notified Plaintiff by text message that Ten Oaks had closed the transaction with Melrose for GKN to divest ASTECH to Ten Oaks, stating: "…we are closed!"

26. Later the same day, on March 11, 2022 at or about 11:30 am Pacific Time, Defendant Lovrovich and Plaintiff talked by telephone. During this call, Defendants, through Defendant Lovrovich, explained that all money wires had been processed and all documents were signed. Reflecting on the process, Defendant Lovrovich mentioned that Boeing's written consent had been the most difficult consent to obtain. Accordingly, Plaintiff formed an objectively reasonable belief that the "closing price" had been paid and Ten Oaks had resolved the other open issues that had been obstacles to closing "the sale" with Melrose (GKN).

27. Defendant Lovrovich further stated that Ten Oaks would send Plaintiff a copy of the written Term Sheet offer via DocuSign to sign and accept the offer, along with another document Plaintiff was required to sign in order to accept the Term Sheet.

28. Defendants, through Defendant Lovrovich, further requested that Plaintiff make business travel reservations to attend Ten Oaks' "Town Hall" sessions scheduled for Monday, March 14, 2022 at ASTECH's offices in Santa Ana, California. Defendant Lovrovich also stated that he would be speaking with Defendant Richeson to prepare for the Town Hall sessions and would invite Plaintiff to join.

29. On March 11, 2022 at or about 12:47 pm Pacific time, Plaintiff sent a text message to Defendant Lovrovich noting that Plaintiff had confirmed business travel reservations, as Defendant Lovrovich had requested, so that Plaintiff would be in attendance for the Town Hall sessions on March 14, 2022 at ASTECH's offices in Santa Ana, California. Defendant

7

Lovrovich replied to Plaintiff via text message by sending a "thumbs up" symbol (emoji) indicating Defendants' approval.

30. Thereafter, Defendant Lovrovich sent a text message to Plaintiff stating that Defendant Lovrovich would send the Term Sheet offer (which, as previously discussed by telephone, was to be sent via DocuSign).

31. On March 11, 2022 at or about 6:58 pm Eastern Time, Defendants, through Defendant Lovrovich, sent the written Term Sheet to Plaintiff via DocuSign. By this time, it was nearly 7:00 pm Eastern time, Plaintiff had already confirmed business travel for Monday, March 14, 2022 as requested by Defendant Lovrovich, to attend the town hall meetings at ASTECH's offices, but did not focus on reviewing the Term Sheet at that time.

32. Plaintiff cursorily reviewed the Term Sheet offer and accompanying document on March 13, 2022, but did not accept the offer at that time.

33. The written "Term Sheet" offer presented by Defendants to Plaintiff was on Ten Oaks letterhead and agreed to by Astech HoldCo through agent Defendant Lovrovich, purportedly on behalf of "Ten Oaks Management, LLC" as the "Manager" of Astech HoldCo.

34. Per the Term Sheet offer, Defendants recruited Plaintiff to serve as the "CEO or President" of ASTECH. In exchange for performing such employment duties, Defendants agreed, among other compensation, incentives, and benefits, that Plaintiff would receive "an annual cash salary from ASTECH of $250,000/year" and would be eligible for an "annual cash bonus" and the employee "health benefits" package. The Term Sheet required Plaintiff, as CEO of ASTECH, to collaborate with "Ten Oaks Management team" to define and achieve ASTECH's strategic goals and related operating initiatives, and to otherwise work with and manage ASTECH's existing management team to achieve its goals.

8

35. On Sunday, March 13, 2022, Defendant Lovrovich invited Plaintiff to join a conference call that Defendant Lovrovich scheduled among Defendant Lovrovich and Defendant Richeson to review the PowerPoint slide materials that Defendants had prepared and to plan speaking roles for Defendants to present information to during several Town Hall sessions for all ASTECH employees that had been scheduled on March 14, 2022 at ASTECH in Santa Ana, California.

36. As a result of the transaction that defendant Ten Oaks closed with Melrose (GKN) the previous Friday, March 11, 2022, all employees of ASTECH were administratively terminated from their employment with ASTECH (in a transparent attempt to avoid any lingering liabilities to employees). Consequently, it was necessary for the "new" ASTECH, now under Defendants' new ownership and control, to hold information sessions and to recruit former employees that had been administratively terminated the prior business day to accept new offers of employment with ASTECH.

37. During the March 13, 2022 conference call, Defendants carefully planned that Defendant Richeson would begin the Town Hall presentation with the first slide titled "ASTECH Under New Ownership" marked as slide #2. Next, Defendant Richeson would present his professional bio on the slide titled "Meet the Ten Oaks Team" marked as slide #3. Then, Plaintiff would present his professional bio, and then Defendant Richeson would resume by presenting Ten Oaks Operating Partner Mads Adams's professional bio. Next, it was agreed that Defendant Lovrovich would introduce himself and assume the presentation by presenting slide #4, which included the professional bios of Defendant Lovrovich. Next, it was agreed that Ten Oaks Vice President Alex D'Angelo was to introduce himself and present his professional bio, also on the slide marked #4. Thereafter, Defendant Lovrovich was to present the slide titled

9

"Why ASTECH?" marked as slide #5.  Next, Defendant Richeson was to present the slide titled "What to Expect" marked as slide #6.  Finally, it was agreed that Defendant Lovrovich would finish the remainder of the employee presentation by presenting the slides titled "What Will Change" marked as slide #7, "Ten Oaks Development Plan" marked as slide #8, and "Frequently Asked Questions" marked as slide #9.  The entire presentation was carefully prepared and thoughtfully planned by Defendants.  Plaintiff had a speaking role, but this was limited to speaking only about Plaintiff's own professional bio and did not involve Plaintiff making any representations about the transaction, Ten Oaks, or Ten Oaks' future plans for ASTECH.

**B. At a Town Hall Meeting with ASTECH's Employees, Defendants Falsely Represent the Nature of Defendants' Acquisition of and Intentions for ASTECH, Seeking to Induce ASTECH's Former Employees to Rejoin the Restructured Company and to Induce Plaintiff to Accept the CEO Position**

25. On Monday, March 14, 2022, the next business day after Ten Oaks acquired ASTECH, Defendants, through Defendant Lovrovich and Defendant Richeson, led three Town Hall meetings, to introduce Ten Oaks/Astech HoldCo. as the new owners of ASTECH and to recruit employees.

26. On Monday, March 14, 2022, Defendants presented the Town Hall meetings at ASTECH's Santa, Ana California headquarters as previously planned.  Defendant Richeson appeared in person in Santa Ana, California and both Defendant Lovrovich and Mr. D'Angelo appeared by video conference.  Audience members, including Plaintiff, were physically present in Santa Ana, California.

27. The Town Hall meetings were presented in person with the use of audio and visual equipment.  Defendant Richeson (in person) used a microphone to amplify his voice and a video projector to display Defendants' slide presentation on a large screen that allowed the audience to read many of the statements verbatim.  Defendant Lovrovich appeared by video

10

conference stream over the same audio and video system using the same slide presentation displayed on the large screen.

28.    Defendant Richeson began the presentation by announcing himself as an agent of Defendants, and he went on to make materially false representations, as written in his portion of the slide presentation, that were designed to appease those in attendance as to Defendants' direction for ASTECH.

29.    The materially false statements made by Richeson on behalf of Defendants at the Town Hall meeting included, but were not limited to, such statements, both verbally and in writing, as:

- *MISREPRESENTATION #1:  "On March 11, 2022, GKN Aerospace completed the sale of ASTECH to a portfolio company of the Ten Oaks Group" (emphasis added).*

Plaintiff objectively believed this was an affirmative statement that Ten Oaks had made a monetary investment in ASTECH, because the "sale" of something means the exchange of that thing for money.  Defendant Richeson use of the word "sale" as written in his portion of the slide presentation was intentional, because (a) Defendant Richeson had rehearsed the presentation as such the day before during the conference call with Plaintiff, (b) Defendant Richeson read his slides aloud to the audience, using a microphone to ensure he was clearly heard and a video projector to display Defendants' slide presentation on a large screen to ensure it was visible to everyone (so the audience could read verbatim), and (c) Defendant Richeson repeated his statements and written presentation at all *three* Town Hall sessions the same way.

*MISREPRESENTATION #2:  "Because we invest our own money, we make decisions that are right for our companies, not bankers and institutional investors" (emphasis added).*

11

This was another affirmative statement, both verbally and in writing, that Ten Oaks had made a monetary investment in ASTECH, because the phrase "we invest our own money" was an obvious reference to a monetary investment in ASTECH.

*MISREPRESENTATION #3: "Ten Oaks Group is a family office headquartered in Charlotte, NC and exclusively focused on investing in corporate divestitures" (emphasis added).*

This was another affirmative statement, both verbally and in writing, that Ten Oaks had made a monetary investment in ASTECH, because "family office" focused on "investing" is understood to be making monetary investments given the context.

*MISREPRESENTATION #4: "Ten Oaks is a 'Family Office' investment group…not a 'Private Equity' investor."*

This was also an affirmative statement, both verbally and in writing, that Ten Oaks had made a monetary investment in ASTECH, because an "investment group" means a group that is investing money, which is what family offices and private equity investors do (they make monetary investments to *acquire* things expected to increase in value), whereas the investment of time and effort *after the acquisition* is not an investment to *acquire* anything).

30.     Later in the presentation, Defendant Lovrovich also made statements on video conference, announcing that Ten Oaks had invested in ASTECH. Defendant Lovrovich, explained, both verbally and in writing, that "ASTECH is an *ideal investment* for Ten Oaks" (emphasis added).  He also stated, both verbally and in writing, that Ten Oaks is focused on investment in ASTECH when he stated: "Ten Oaks' resources, experience, and *focus on investment in the business*, combined with a more flexible management structure will allow ASTECH to thrive" (emphasis added).  This was an affirmative statement, both verbally and in

12

writing, that Defendants planned to make further monetary investments in ASTECH, because Defendant Lovrovich had taken care to distinguish between various ways that Ten Oaks would help ASTECH thrive, through Ten Oaks' "resources," "experience," and "focus on investment in the business." In this manner, Ten Oaks further represented that it planned to make further investments of its own money into ASTECH.

31. After each of the Town Hall presentations concluded, employment information packets were provided to the audience. During this time, some individuals came forward from the audience to introduce themselves to Defendant Richeson and Plaintiff. One such person stated to Plaintiff, among other statements: "I just want to say that I really liked the presentation and especially that Ten Oaks is a *family office* and that they *invested their own money*. We have a lot of opportunities, and I think I am going to really like working with Ten Oaks" (emphasis added). Shortly thereafter, the person left to join the line to receive her employment information packet to accept employment with Defendants.

32. Plaintiff later learned that those statements by Defendants at the Town Hall meetings were not true, among others, and were, in fact, material misrepresentations designed to mislead and induce persons to work for ASTECH.

33. In reliance on the material misrepresentations made by Defendants, ASTECH's prior employees signed agreements to accept their new (continued) employment with the ASTECH now under Defendants' ownership and control.

34. As to Plaintiff specially, on March 15, 2022, at or about 10:10 am Pacific time, Defendants, through Ten Oaks principal and general counsel John Curtis Griner, provided a copy of the Transition Service Agreement ("TSA") between Melrose (GKN) and ASTECH to Plaintiff in California. Among other things, the TSA stated that it was pursuant to a separate Asset

13

Purchase Agreement "by and among the Seller and the Buyer" and that "the Seller had *sold* to the Buyer" and "the Buyer had *purchased* from the Seller, the Purchased Assets" (emphasis added). Accordingly, Plaintiff strongly believed the oral and written statements that had been made by Defendants at the Town Hall meetings the previous day and at other times.

35. As to Plaintiff specifically, on March 15, 2022 while still in California and in reliance on the above-referenced material misrepresentations (and others) made by Defendants previously, Plaintiff made a telephone call to Bay Area Retina Associates in Walnut Creek, CA to decline an employment opportunity to be their Chief Executive Officer, by notifying them that Plaintiff intended to accept a different Chief Executive Officer role in California (for Defendants). Had Plaintiff known that Defendants were making material misrepresentations to him and others, he would have declined to work for Defendants as the CEO of ASTECH and, instead, would have taken the CEO position with Bay Area Retina Associates.

36. On March 15, 2022, Defendants, through Defendant Lovrovich invited Plaintiff, while still in California, to join Defendant Lovrovich for a dinner in California, at Solstice Seasonal Kitchen & Bar, 18555 Jamboree Rd., Irvine, CA 92612. Defendant Lovrovich chose the restaurant, and he provided transportation from ASTECH to the restaurant by driving himself and Plaintiff to the restaurant in Defendant Lovrovich's rental car. During the car ride from ASTECH to the restaurant, at the restaurant over dinner, and during the car ride after dinner, Defendant Lovrovich further recruited Plaintiff, made representations about Ten Oaks' plans to obtain financing for ASTECH, and affirmed Defendants' prior illustrative assessment of the future equity value available to Plaintiff.

37. Defendant Lovrovich stated that his prior convictions about ASTECH were stronger now, based on his observations from touring the facility, the facility's considerable

14

fixed assets (*i.e.*, machinery, equipment, etc.), and his impressions of the management team and employees that he had met. Specifically, Defendant Lovrovich affirmed to Plaintiff that Ten Oaks' plans were to for ASTECH to obtain an ABL (asset-backed loan) by using ASTECH's fixed assets (*i.e*., machinery, equipment, etc.) to provide necessary collateral for the loan in order to provide additional financing for ASTECH.  Defendant Lovrovich stated that ASTECH would start the process of obtaining an independent appraisal of the market value its fixed assets, which he explained was required by lenders in order for a borrower to secure an ABL.

38.     In further reliance on the above-referenced material representations made by Defendants during his recruitment, including the "illustrative returns analysis" of potential equity value in February 24-25, 2022 represented by Defendants to Plaintiff, the representations at the Town Hall meeting on March 14, 2022 in California, and during the March 15, 2022 dinner and related discussions (and other misrepresentations as described above and herein), while in California Plaintiff competed review and signed the Term Sheet via DocuSign on March 16, 2022 at or about 9:06 am Pacific Time to accept employment with Defendants as CEO of ASTECH.

**C.      After Accepting the CEO Position at ASTECH, Plaintiff Learns the Truth about Ten Oak's Acquisition of ASTECH and its Intentions for ASTECH**

39.     Soon after turning down the CEO position with Bay Area Retina Associates and accepting the role offered by Defendants, Plaintiff began to uncover that Defendants had made material misrepresentations and omissions and were engaged in unlawful and unethical conduct. Specifically, Plaintiff became aware of startling facts, revelations, and decisions by Defendants and their agents that were contrary to what they had told Plaintiff, ASTECH employees, and certain customers.

40.     As referenced previously, on March 14, 2022, Defendants falsely told Plaintiff and ASTECH employees, both verbally and in writing, at three Town Hall presentations in California that Ten Oaks had invested its own money in the acquisition of ASTECH. Defendant Richeson, as representative of the other Defendants, used written PowerPoint slides that he read stating that "GKN Aerospace completed the *sale of ASTECH* to a portfolio company of the Ten Oaks Group" (emphasis added) and that Ten Oaks is a "family office" "exclusively focused on *investing* in corporate divestitures" (emphasis added).  Defendant Richeson further represented, both verbally and through the written PowerPoint slides, that "Because *we invest our own money*, we make decisions that are right for our companies, not bankers and institutional investors" (emphasis added).  As such, Defendant Richeson communicated to everyone at all three Town Hall meetings that Defendants, through Ten Oaks, had invested their own money in the "sale of ASTECH."

41.     Later in the March 14, 2022 Town Hall presentation, Defendant Lovrovich stated, both verbally and in writing, that "ASTECH is *an ideal investment*" for Ten Oaks and that "Ten Oaks' resources, experience, and *focus on investment* in the business, combined with a more flexible management structure would allow ASTECH to thrive" (emphasis added).  As such, Defendant Lovrovich distinguished between Ten Oaks' "resources," its "experience" and its "focus on investment in the business."  In this manner, Defendants represented that Ten Oaks planned to make further investments of its own money in ASTECH.

42.     The above statements were not true and Defendants knew Ten Oaks had not invested any money, would not invest any money, had no intentions of making decisions in the best interests of ASTECH, and knew ASTECH would not thrive.  Contrary to Defendants' misrepresentations, helping "ASTECH to thrive" was not their plan.

16

43.     Beginning with a March 16, 2022 conversation that occurred in a car ride traveling from ASTECH in Santa Ana, California to a dinner gathering at Mr. Hahn's home in Beverly Hills, California, Plaintiff learned the truth about Defendants' acquisition of ASTECH. Defendants, through Mr. Hahn, Defendant Lovrovich, Defendant Richardson, and others continued to reveal the truth at the March 16, 2022 dinner party; during the subsequent workweeks of March 21, 2022, April 4, 2022, and April 11, 2022; and at various other times. The revelations made by Defendants included, but are not limited to, the following:

### a. Rather than Investing their Own Money, Ten Oaks Was Paid About $7 Million To Take ASTECH

44.     On March 16, 2022, Mr. Hahn and his wife, Mrs. Adrienne Hahn (Operating Partner at Ten Oaks), co-hosted a dinner party at their home in Beverly Hills, California, to celebrate the recently completed acquisition of ASTECH. Defendant Lovrovich had invited Plaintiff because Plaintiff had just accepted employment as CEO and Defenant Lovrovich wanted Plaintiff to meet Mr. Hahn. Defendant Lovrovich and Plaintiff drove together from ASTECH's offices in Santa Ana, California to the dinner party in Defendant Lovrovich's rental car, arriving together. Upon arriving at the dinner party, Defendant Lovrovich introduced Plaintiff to Mr. and Mrs. Hahn, and they in turn introduced Plaintiff to other invited guests at the dinner party, which included Mr. Louis Hashtroudi (Investment Lead at Ten Oaks), as well as Mr. Hashtroudi's wife and daughter. After introductions, Mr. Hahn asked Plaintiff to accompany him separately on a walking tour of his home. During the house tour, Mr. Hahn also recounted to Plaintiff how Ten Oaks had purchased and sold numerous corporate divestures over the years, for which Mr. Hahn said he had made "millions and millions" of dollars.

45.     After the house tour, Plaintiff returned to the kitchen area to mingle with other guests and later joined a discussion near the kitchen that was occurring between Mr. Hashtroudi

and Mr. Hahn. Mr. Hashtroudi recounted his first in-person meeting with Melrose in London, in which Mr. Hashtroudi explained that he had floated the proposition to Melrose that GKN Aerospace should divest ASTECH to Ten Oaks for the closing price of only $1. This caused Mr. Hahn to laugh aloud, stating to Mr. Hashtroudi: "See, that's why I call you the Sleuth!" (Mr. Hahn's nickname for Mr. Hashtroudi was "the Sleuth," and he called him by that nickname loudly and affectionately). Mr. Hahn further remarked that he was amazed that that "[we] got them all the way up to $7 million!" Based on the context, Plaintiff realized that Mr. Hahn was stating the truth that *Melrose had paid Ten Oaks about $7 million to take ASTECH*. Upon hearing this, Plaintiff was shocked and could hardly believe what he had heard. Plaintiff sought clarification, and Mr. Hahn explained that ASTECH had been a "pay-to-take" deal, in which Melrose, through GKN, had paid Ten Oaks, through ASTECH, to take ASTECH, because ASTECH was so unprofitable for Melrose (GKN) due to ASTECH's customer contracts, poor product quality, and GKN's lack of capital investment in ASTECH.

46. Separately, as groups mingled and shifted, Mr. Hahn explained to Plaintiff that, contrary to what Plaintiff had been led to believe before accepting his position, Ten Oaks had not invested any of its own money to acquire ASTECH and, furthermore, that Ten Oaks would not invest any of its own money in ASTECH.

> **b.** **Ten Oaks Took Control of ASTECH as a "Service" to Help Melrose Divest an Unwanted Investment**

47. During the car ride to Mr. and Mrs. Hahn's March 16, 2022 dinner party, Defendant Lovrovich explained to Plaintiff more about the business of Ten Oaks in general and about Mr. Hahn in particular, since they were driving to Mr. Hahn's home where Plaintiff was about to meet Mr. and Mrs. Hahn for the first time.

18

48. Among other things, Defendant Lovrovich explained to Plaintiff that while Ten Oaks refers to itself as a family office "exclusively investing in corporate divestures," the truth is that it is often "providing a service" for the corporate development teams of organizations, such as Melrose, to help them optimize their portfolios of businesses by allowing them to quickly and discretely divest their unprofitable businesses as carve-outs to Ten Oaks who can then more easily and discreetly dispose of unwanted businesses or quickly resell them for a higher price.

49. Defendant Lovrovich explained that this "service" provided by Ten Oaks in an underserved niche in the private equity market allows larger organization, such as Melrose, to (a) avoid typical lengthy periods of due diligence by prospective buyers and minimize the resource commitment generally required from corporate development teams (the sellers) to support buyer's due diligence that often may not result in closing the sale of the unwanted divestures, and (b) avoid the publicity and reputational risk of contract disputes, commercial disagreements, employee layoffs, and liquidation proceedings that often result from divesting or shuttering businesses.

### c. Ten Oaks Intentionally Does Little or No Due Diligence on the Companies It Acquires, Including ASTECH

50. Defendant Lovrovich explained to Plaintiff that Ten Oaks often obtains unwanted corporate carve-outs at very deep discounts, in which case they often flip (resell at a higher price) the divested businesses as soon as separation activities are completed or they liquidate them as soon as possible (and salvage any remaining assets).

51. Defendant Lovrovich explained that because Ten Oaks is a relatively small, privately owned organization, it has been successful in the past at outmaneuvering other parties using its speed and its willingness to make big decisions quickly with "very little due diligence" and "sometimes no due diligence at all."

19

52. Defendant Lovrovich explained that Ten Oaks is not overly concerned with the ramifications of its business risks and their activities, because the Ten Oaks' co-founders and co-owners, Mr. Hahn and Matthew Magan, anticipate they will make mistakes. Therefore, Ten Oaks has created legal entities to shield its owners' risk.

53. Defendant Lovrovich explained that Ten Oaks' co-founders, Mr. Hahn and Mr. Magan, store Ten Oaks' investable cash in their personal bank accounts (and not Ten Oaks' operating bank accounts) and fund the Ten Oaks management company as needed, so that there are no significant cash reserves in the name of Ten Oaks at-risk if they get sued.

54. Defendant Lovrovich also explained that defendant Ten Oaks and its portfolio companies often take precautions to include John Curtis Griner (General Counsel to Ten Oaks), on their internal email chains about sensitive topics and mark emails "attorney-client privileged," even when the communications deal with normal business issues as opposed to litigation strategy or legal advice. This was done to protect these communications from discovery, because Defendant Lovrovich explained that divestures, such as ASTECH, often involve risky activities, particularly when doing turnarounds, reorganizing, or liquidating companies.

### d. Among the Reasons Melrose Wanted GKN to Dispose of ASTECH was an Unprofitable Contract with Boeing

55. Defendant Lovrovich revealed to Plaintiff that Melrose had wanted GKN to dispose of ASTECH for many reasons, including a certain Boeing contract that was highly unprofitable for ASTECH year-after-year, and thus a drag on GKN's earnings year after year, and thus a drag on Melrose's earnings year after year.

56. However, Defendant Lovrovich explained to Plaintiff that while Melrose desperately wanted GKN to dispose of ASTECH, it also wanted to preserve GKN's commercial relationships with Boeing and other customers, so that GKN could maintain and pursue other

lucrative sales contracts with Boeing and other customers. As such, Defendant Lovrovich explained that it was imperative to Melrose for GKN to unload ASTECH (along with its Boeing contract) without causing a commercial or contract issue with Boeing. Given the situation, Defendant Lovrovich explained that Melrose had determined its most expedient course of action was simply to "dump ASTECH" to Ten Oaks, so Melrose, through GKN, had *paid* Ten Oaks, through ASTECH, to "make ASTECH and its Boeing contract go away."

          **e.**     **Defendants Knew Melrose's Payment Was Intended to Compensate Ten Oaks for Potential Liabilities Associated with Owning ASTECH, Including the Risk that GKN Would Not Renew ASTECH's Lease**

57. Defendant Lovrovich explained to Plaintiff that the approximately $7 million payment from Melrose, through GKN, paid to Ten Oaks, through ASTECH, was intended to compensate Ten Oaks to assume liabilities during GKN's ownership of ASTECH, to cover the risk related to the renewal of the ASTECH's facility lease (since GKN did not want to exercise its lease renewal option), to cover certain existing customer claims against ASTECH related to defective product quality, to cover the unprofitability of the Boeing contract, and to cover the cost to liquidate and/or reorganize ASTECH if necessary, as well as for ordinary course working capital. In short, Defendant Lovrovich explained that the payment of approximately $7 million was intended to cover anything and everything required to make ASTECH go away.

58. Moreover, Defendant Lovrovich explained that the payment from Melrose, through GKN, to Ten Oaks, through ASTECH, had been carefully structured and communicated as a pre-close cash contribution for ordinary course working capital that Melrose would pay from GKN directly to ASTECH (and not paid directly to Ten Oaks), so that it would not raise suspicions. By doing so, the payment was made without disclosing the "pay-to-take" deal to all parties, including customers (such as Boeing) and employees, all of whom Defendants knew would have otherwise withheld their consent or support to the transaction.

21

59. In a further attempt to conceal (and to feign an attempt at disclosure, in case they were later questioned), Defendants explained to Plaintiff that Defendants had made affirmative statements to Boeing and others, that the payment from Melrose, via GKN, to ASTECH, was merely a pre-close cash contribution for ordinary course working capital, so that it would not raise suspicion. However, Defendant Lovrovich explained that payment amount of about $7 million was NOT based upon ASTECH's actual required level of ordinary course working capital, though it was expedient for them to call it that. Instead, Defendant Lovrovich explained to Plaintiff that the payment amount had been negotiated through a lengthy process with Melrose in which the parties contemplated a wide range of business risks, legal risks, and reputational risks, which Melrose (GKN) sought to avoid and which Ten Oaks was willing to take for the right payment. Defendant Lovrovich explained that Melrose (GKN) had estimated that their own internal cost to dispose of ASTECH would be in the range of $9 million to shutdown ASTECH, liquidate its assets, and settle claims with employees, vendors, and other parties.

60. In addition, Defendant Lovrovich explained that Melrose (GKN) was concerned about provoking a potential contract and commercial dispute with Boeing and others, which was an additional cost to them that was uncertain. Melrose also was concerned about the public criticism that Melrose and GKN might incur for shuttering yet another small business and laying off so many employees, especially in the State of California, which was known for protecting employees from harm resulting from reckless corporate interests. As such, Defendant Lovrovich explained that it was expedient for the parties to state, as they did, that the payment was merely a pre-close cash contribution for ordinary course working capital, whereas the fee was the "pay-to-take" for Ten Oaks' "services" to take ASTECH, including its assets, certain liabilities, and contracts, including its long-term contract with Boeing.

22

61. Defendant Lovrovich explained that it was expressly discussed and understood with Melrose, represented by Mr. Robert Swanton (Corporate Counsel for Melrose North America, Inc.) that GKN would *not* exercise its contract option to extend ASTECH's lease of the premise at 3030 Red Hill Ave., Santa, Ana California 92705 beyond the end of the current lease on May 31, 2023; and therefore, it was discussed and understood that Ten Oaks would be responsible for negotiating the renewal of ASTECH's lease directly with ASTECH's landlord [represented by Mr. Richard Lucy and Mr. Sahar Bina] and if the landlord did not agree to extend the lease term beyond May 31, 2023 then Ten Oaks, through ASTECH, would bear the risk and potential cost, as needed, to purchase the facility, relocate, or shutdown ASTECH along with the business risks and contract liabilities to customers that would be incurred. Defendant Lovrovich explained that these lease issues and implications had been thoroughly discussed and were an explicit condition of Defendants' negotiations with Melrose (GKN).

62. In fact, Mr. Griner (General Counsel to defendant Ten Oaks) sent an email to Mr. Swanton, representing Melrose (GKN), which he also sent via copy to Plaintiff, Defendant Lovrovich, Mr. Bede (Assistant General Counsel to defendant Ten Oaks), and Mr. Nozemack of Melrose (GKN), on May 24, 2022, stating among other things: "We [Defendants] acknowledge that this action by GKN [to decline to extend the lease of ASTECH's facility at 3030 Red Hill Ave, Santa Ana, California] is consistent with our pre-closing discussions regarding the lease and that ASTECH will work directly with the landlord to secure new lease terms."

63. Accordingly, Defendants had known and agreed as a pre-closing condition of the sale that there were serious risks concerning ASTECH's lease renewal and Defendants had agreed they would be responsible; and Defendants withheld this material information (and other material information) while recruiting Plaintiff and other employees to accept their roles.

### f. Ten Oaks Charges Management Fees Retroactively

64. Defendant Lovrovich explained that Ten Oaks regularly charged other portfolio companies a management fee to cover operating expenses, similar to the normal fees charged by other private equity investment firms that manage portfolio companies, and that Ten Oaks would charge the same or similar fees to ASTECH.

65. However, Defendant Lovrovich explained that Ten Oaks' approach was to charge its management fees retroactively, but not to accrue the management fees on ASTECH's financial statements. As such, Ten Oaks kept its management company fees off the books of its portfolio companies until charged in full retroactively thus creating a false accounting and giving Ten Oaks leeway as to charge whatever fee it wanted to charge later.

### g. Ten Oaks Misused the Term "Family Office" To Deceive

66. Defendant Lovrovich also explained that Defendants found it expedient to describe Ten Oaks as a "family office" (drawing a distinction between themselves and private equity firms), because he explained that a *bona fide* family office is generally known to have flexibility on investment strategy, objectives, and timelines, whereas the public often has a negative perception of private equity investors which generally operated on a more expedited timeline to realize their equity investments.

67. To make his point, Defendant Lovrovich explained that during the Town Hall information session on March 14, 2022 (and at other similar town hall information sessions that Defendant Lovrovich had presented), Defendant Lovrovich knew the term "family office" was more appealing to employees and other stakeholders rather than other descriptions, such as "private equity."

68. Defendant Lovrovich also explained that "family office" was expedient, because it was sufficiently *vague* that it allowed for different narratives to be communicated in various

24

contexts, depending on the particular situation and stakeholders, whether the audience was a corporate development professional with a prospective divesture deal, the management team of a target divesture, employees of a company to be divested, customers, vendors, lenders, and others.

69. Based on Defendant Lovrovich's comments, Plaintiff became aware that Ten Oaks exploited the ambiguity of the being a "family office" to make a wide range of material representations (or misrepresentations and omissions) by tailoring their *story* about itself and its investment goals, strategies, and timelines to influence a wide range of situations and stakeholders in its favor.

### h. Defendants Misled Plaintiff About Ten Oaks' Intent to Obtain Financing for ASTECH

70. In connection with recruiting Plaintiff, Defendants repeatedly told Plaintiff that ASTECH would get additional funding through an asset-backed loan ("ABL") using ASTECH's fixed assets as collateral for the loan. Defendants' statements were intended to deceive Plaintiff into believing that ASTECH had sufficient funding lined up and/or a way to obtain reserves for the long-term.

71. Defendants represented this to Plaintiff on various occasions, including through Defendant Lovrovich (a) on March 11, 2022, after closing the transaction, during a telephone call with Plaintiff to recruit Plaintiff to accept employment, (b) on March 15, 2022 during a facility tour with both Plaintiff and ASTECH Chief Operating Officer Scott Gulyas at ASTECH in Santa Ana, California, and (c) on March 15, 2022 at a dinner meeting with Plaintiff to recruit Plaintiff at Solstice Seasonal Kitchen & Bar, 18555 Jamboree Rd., Irvine, California 92612.

72. During the above referenced meetings in California on March 15, 2022, Defendants told Plaintiff that they planned for ASTECH to obtain an ABL by using ASTECH's fixed assets (*i.e*., machinery, equipment, etc.) to provide necessary collateral for the loan, which

would provide financing for ASTECH. Defendants stated that ASTECH would start the process of obtaining an independent appraisal of the market value its fixed assets, because an independent appraisal was required by lenders for an ABL.

73. Even after Plaintiff learned that Ten Oaks had not and would not invest any of its own money in ASTECH, Defendants repeated their prior statements that Defendants would obtain financing for ASTECH through leveraging ASTECH's own assets. Specifically, during the dinner gathering at Mr. Hahn's home on March 16, 2022, during the subsequent workweek of March 21, 2022, and various times thereafter, Defendant Lovrovich stated as such to Plaintiff.

74. As CEO, Plaintiff relied on the above statements by Defendants because it was particularly necessary to obtain ABL financing once Defendants had revealed to Plaintiff that they had not and would not invest any of their own money in ASTECH.

75. Based on Defendants' assurances, Plaintiff and others, including Mr. Gulyas, relayed the plans to ASTECH's management team that the intent of the appraisal was to determine the value of the fixed assets as collateral to be used to apply for financing.

76. As such, ASTECH employees, such as Plaintiff, Mr. Gulyas, Ms. Colleen River (ASTECH Facilities Manager), and others were reassured as to rationale for obtaining the appraisal.

77. Soon thereafter, Defendants arranged for Hilco Valuation Services, LLC ("Hilco") to conduct the appraisal, which required representatives (appraisers) from Hilco to visit and inspect ASTECH's machinery and equipment, which in turn required the cooperation of many ASTECH employees, including Ms. River (ASTECH Facilities Manager), to provide access to the equipment and answer questions from the appraisers during their visit about the specifications and condition of the equipment.

26

78.     The appraisal report completed by Hilco demonstrated considerable value in ASTECH's assets and sufficient to apply for financing. As such, the next logical step would have been to apply to lenders for ABL financing, but Defendant Richeson surprised Plaintiff by telling Plaintiff that Defendants did <u>not</u> want ASTECH to apply for any financing.  Defendant Richeson explained that, in fact, Defendants did <u>not</u> want to apply for financing, because Defendants did <u>not</u> want any lender to have a *lien* on ASTECH's fixed assets.  Moreover, Defendant Richeson explained that the appraisal report was to know the market value of ASTECH's fixed assets should Defendants need to leverage them for Defendants to pay liquidation costs and/or evaluate a possible reorganization of ASTECH.

79.     At or about this time, Defendant Richeson asked Mr. Adams to undertake a project related to liquidation scenario planning.

80.     Plaintiff was stunned to learn that Defendants had lied to him and others about wanting to obtain financing.  Plaintiff had been misled by Defendants about their true intent not to apply for financing, which caused Plaintiff to unknowingly repeat the same misleading rationale to ASTECH's management team and employees.  Defendants wanted Plaintiff and others to believe and rely on the false story that the intent of the appraisal was to apply for financing, so that Hilco would complete its fixed asset appraisal without raising the suspicion of liquidation or reorganization.

81.     Since Plaintiff had been misled by Defendants on this important matter of financing, he wondered if he or others were being misled on other matters.  Although Plaintiff raised concerns directly to Mr. Gulyas and Mr. Adams that Ten Oaks would not apply for financing, Plaintiff was hesitant to raise his concerns publicly or more broadly to the employees

27

as a whole or to Defendants out of concern that doing so might cause retaliation resulting is his termination by Defendants.

82. In addition, Plaintiff became concerned about the practical considerations and future of the ASTECH business, given $0 investment from Ten Oaks and now $0 financing. Plaintiff felt that Defendants were intentionally causing serious liquidity issues for ASTECH, impairing its ability to service its customers and make the improvements in the company that Defendants had committed publicly to employees and its major customers. Defendants had misled Plaintiff both in the recruitment of Plaintiff and in the early days of his work for Defendants and Plaintiff's reliance on such misrepresentations have caused Plaintiff harm.

## II. DEFENDANTS TERMINATED PLAINTIFF FROM THE CEO POSITION AT ASTECH AFTER HE REFUSED TO PARTICIPATE IN AND COMPLAINED ABOUT THEIR ONGOING FRAUD AGAINST BOEING

### A. While Serving as ASTECH'S CEO, Plaintiff Learns that Defendants Misled Boeing into Approving Defendants' Acquisition Of ASTECH

83. Upon information and belief, for Ten Oaks to acquire ASTECH, Defendants needed ASTECH's key customers, such as Boeing, to give their written consent to allow Ten Oaks to acquire ASTECH from Melrose (GKN).

84. Among other reasons, Boeing's contract with Melrose (GKN) gave Boeing the right to review and approve (or prevent) any change of ownership of ASTECH. This was an absolutely essential provision of Boeing's contract with Melrose (GKN), because ASTECH was a sole source supplier of certain key parts for certain Boeing aircraft and if ASTECH stopped production, then Boeing would have to stop production and stop MRO (maintenance, repair, and operations) activity to keep aircraft in service, triggering massive financial damages to Boeing and also to Boeing's customers, including the U.S. government. As such, Boeing and similarly

28

situated customers are extremely attentive to review and approve divestitures such as the ASTECH transaction.

85.     From his very first day of employment for Defendants, Plaintiff worked to (1) continue development of ASTECH's commercial function, (2) improve product quality (reduce scrap), and (3) improve equipment and maintenance (reliability). Plaintiff's success at improving product quality (reducing scrap), improving cost (reducing overtime), and in other areas was reported to Defendants in writing, via a "daily quick report," sent daily and updated daily and weekly, which showed overall improvement trends in these measures, as compared to the baselines (starting point) at the time when Plaintiff was hired. Production shipping schedule adherence and liquidity remained serious challenges for ASTECH, due to Defendants' lack of monetary investment in ASTECH and their refusal to allow a lenders' lien to obtain financing so ASTECH could improve its machinery, equipment, systems, and other areas, despite their public statements to the contrary. In addition, Plaintiff and Mr. Gulyas also reported progress verbally to Defendants, through Defendant Lovrovich and Defendant Richeson, at scheduled meetings generally every Tuesday afternoon. Finally, Plaintiff reported progress verbally, separately to Defendants, through Defendant Lovrovich and Defendant Richeson, at scheduled meetings generally every Friday afternoon.

86.     Beyond the three primary areas of focus to develop ASTECH's commercial function, improve product quality (reduce scrap), and improve equipment and maintenance (reliability), Plaintiff held regularly scheduled weekly meetings (sometimes more frequently) to engage the entire ASTECH management team on multiple topics, including: (a) Commercial, Programs, and Proposals; (b) Product Quality & QMS Improvement; (c) CAPEX & Facilities Management; (d) Health Safety & Environment; (e) Sales, Inventory & Operations Planning; (f)

29

Information Technology Steering Committee; and (g) Talent Acquisition & Organization. Moreover, Plaintiff scheduled visits at least weekly (and sometimes daily) with Mr. Gulyas and Mr. Doug Benson (ASTECH Director of Operations) to oversee manufacturing with respect to panel fabrication, welding, stretch wrap forming, hot forming, and other areas on both first shift and on second shift.

87.     However, Plaintiff was subject to significant limitations imposed by Defendants on Plaintiff's work methods that slowed progress.  Plaintiff sought to restructure management roles of the company, because this was a logical and necessary step to put managers in the right roles with the right scope of responsibilities to achieve certain objectives.  Plaintiff and Mr. Gulyas briefed their intended organizational changes at a meeting together with Defendant Richeson and Defendant Lovrovich to keep them informed.  However, rather than holding Plaintiff accountable for *results*, Defendants directed *how* Plaintiff could accomplish work: Defendants, directly through Defendant Lovrovich and Defendant Richeson would NOT allow Plaintiff to make any organizational changes until Defendant Lovrovich and Defendant Richeson had further time to evaluate and decide if Defendants would permit any changes.  As such, Defendants directly managed and controlled Plaintiff's work methods.

88.     As a result of Defendants' interference, Defendants further impeded Plaintiff's attempt to effectuate a positive turnaround of ASTECH.

89.     Despite Defendants' interference, Plaintiff opened direct channels of communication between ASTECH and its major customers and formed strong working relationships with key contacts in each customer's procurement organization, beginning with outreach coordinated with Mr. Gulyas to customers, including Boeing, in writing within 48 hours after Plaintiff had accepted employment.

30

90. During subsequent conversations and emails with customers, including Boeing and others, Plaintiff introduced himself, developed rapport, and explained that ASTECH needed to arrange customer meetings to discuss price support (price increases), because ASTECH could not afford to manufacture under the price terms of its existing contracts and needed resolution of past due invoiced amounts.

91. To Plaintiff's surprise, during telephone calls that he initiated to customers, such as Boeing, represented by Mr. Jonah Cannon (Boeing Procurement Agent), existing customers were astonished to hear that ASTECH wanted to discuss contract price increases. Customers generally explained that (1) they had consented to Ten Oaks' acquisition of ASTECH, in reliance on Defendants' representation that they had read and understood the existing customers contracts, including the detailed pricing terms of the contracts, and notwithstanding Ten Oaks had chosen to assume the existing contracts; (2) they had consented to Ten Oaks ownership, in reliance on Ten Oaks' commitment to invest its financial resources in ASTECH to make the company stronger; and (3) they had consented to Ten Oaks' acquisition of ASTECH, in reliance on Ten Oaks' commitment to obtain financing for the business. One customer even noted to Plaintiff that defendant Ten Oaks had stated in writing when seeking approval of the acquisition, that, "[the] first Guiding Principle of the separation is to minimize customer disruption."

92. Plaintiff listened patiently, understood, and acknowledged the concerns of customers, but he did not comment on their concerns, because (1) Plaintiff had no involvement prior to the sale of ASTECH and (2) Plaintiff was reluctant, without knowing more, to say anything that might confirm or contradict the representations that customers insisted were made by Defendants before Plaintiff's involvement. As such, the discussions with customers became

31

more difficult and eventually stalled as existing customers became slow to schedule meetings and unwilling to meet urgently, despite requests from Plaintiff.

93.     However, in discussions with customers to which Defendants had made no prior representations (had no pre-transaction communications), Plaintiff was extremely successful at rapidly developing new commercial business for ASTECH.

94.     For example, on May 10, 2022, Plaintiff hosted a customer visit by the Chief Engineer of ITP Aero and Chief of Manufacturing Engineering of ITP Aero to ASTECH's facility in Santa Ana, California, to discuss commercial opportunities, programs, and design and engineering capabilities.  After the visit, later the same day, May 10, 2022, Plaintiff received an email message from the customers expressing their thanks for the visit and intention to develop the mutual business relationship. Plaintiff responded via email the next day, May 11, 2022.  Soon thereafter, on May 18, 2022, the customer responded to Plaintiff and requested their engineering team at ITP Aero work directly with ASTECH's engineering team on a preliminary design for a project.  As such, Plaintiff was quick and effective at developing new business in situations where Defendants had not made prior representations.

### B.     Defendants Attempt to Force Price Increases on Boeing

95.     Defendants became impatient because, without investing any of Ten Oaks' own money and without ASTECH pursuing financing (as publicly promised), the only way to sustain the business was to force price increases from existing customers, notwithstanding their public representations to the contrary.

96.     Defendants, directly through Defendant Richeson, required a hardline strategy with existing customers.  Under this strategy, ASTECH would send existing customers letters demanding unit price increases and threatening manufacturing shutdowns unless there was

32

resolution on pricing and other past due amounts.  The letters justified their demands by citing contract affordability concerns and claiming that ASTECH needed price support (price increases) to continue to serve its existing customer contracts.  The strategy was conceived by Defendant Richeson and it was adopted by Defendants who then instructed Plaintiff on how to proceed in sending demand letters.

97.    Mr. Gerrod Bede (Assistant General Counsel to defendant Ten Oaks), drafted and reviewed each demand letter before it was sent by Plaintiff.

98.    Mr. Precht (ASTECH Program Manager) provided supporting exhibits (i.e., invoices accounting and commercial letter attachments) incorporated into each demand letter that Plaintiff was required to send.

99.    On Thursday, May 19, 2022 at or about 3:41 pm Pacific Time, in accordance with Defendants' direction, Plaintiff emailed a demand letter drafted by Mr. Bede to Boeing's representative, Mr. Johan Cannon (Boeing Procurement Agent).  As courtesy, Plaintiff called Mr. Cannon earlier on May 19, 2022 to let him know in advance that a demand letter stating urgent commercial issues would be forthcoming.   Plaintiff also had a telephone call that day with Ms. Barbara Zetterberg (Boeing Director of Contracts) to ensure that she also understood the commercial items, as stated in the demand letter sent to Boeing.

100.    On May 21, 2022 at or about 3:56 pm Pacific time, Plaintiff received a letter reply from Boeing, dated May 21, 2022, stating among other things that "Boeing will not entertain price increases under the threat of non-performance" and objecting to pre-close representations made by Defendants.  Given the serious tone and legal references to "rights and remedies under the Agreement, at law and in equity" in Boeing's letter, Plaintiff acknowledged receipt and sought guidance from Defendants, since (1) it was obvious that Boeing was *not* agreeing to price

33

increases in response to the Defendants' strategy to send demand letters and (2) Plaintiff had no involvement with Boeing (or any other customers) that occurred prior to the sale of ASTECH.

101.    Eventually, Mr. Griner responded on May 22, 2022 at or about 2:16 pm Pacific time, in an email stating: "Let's discuss tonight at 8:30 pm ET [5:30 pm PT].  I know Dave [Richeson] will be out of pocket at that time, but that's our only option since Jack [Plaintiff] is tied up all day tomorrow. I have a few questions for Jack [Plaintiff] to help think through our options.  We can then re-group (by phone or email) before responding to Boeing. Jack promised a response to Boeing in his acknowledgement to their letter, so I do think we need to plan to send them something by EOD Tuesday [May 24, 2022]."

102.    However, Defendants unilaterally changed plans and met separately *without Plaintiff* to discuss the issue and decide amongst themselves on a response. On May 22, 2022 at or about 3:02 pm Pacific time, Mr. Griner sent an email stating: "Andrew [Defendant Lovrovich] and I [Mr. Griner] just caught up with Dave [Defendant Richeson] before his flight. In short, we agreed that we should *hold* the shipment [Boeing 767 Tanker Kit] until Dave and Jack are both on the ground tomorrow and we can coordinate as a group on next steps. Dave will send a more details summary later this evening. In light of this discussion, I think we can go ahead and cancel the 8:30 pm [5:30 pm Pacific time] call this evening" (emphasis added).

103.    Thereafter, on May 22, 2022 at or about 4:36 pm Pacific Time, Defendant Richeson sent an email that Plaintiff and Defendant Richeson needed to prioritize getting together detail regarding Boeing issues. Defendant Richeson stated that he wanted to have dinner with Plaintiff without Mr. Gulyas present and that Defendant Richeson would arrive at ASTECH on March 23, 2022 at around 7:30 am Pacific time.

34

104. Upon reviewing Defendants' direction to hold the Boeing shipment, Plaintiff worried that Defendants did not realize that it was not possible to hold the shipment *without any making notification to Boeing*. As a practical matter, upon withholding any product shipment, Boeing would realize this, because there were frequent and ongoing communications in the ordinary course between ASTECH employees and Boeing with respect to "line of balance" reporting (rate of production), operational issues, engineering issues, and shipping pickup and delivery status. Therefore, to hold (not to ship) the finished product, as Defendants had expressly directed Plaintiff in writing, it was necessary to provide at least some minimal communication to Boeing in order to avoid widespread confusions at ASTECH, as well as at Boeing. Given the ASTECH factory was part of an integrated supply chain serving the Boeing Production System, it was *not* so simple, as Defendants had directed, to withhold the product shipment without any communication to Boeing whatsoever.

105. To remedy, Plaintiff again sought guidance from Defendants, by calling Defendant Lovrovich's mobile telephone but received no answer. Thereafter, at or about 5:38 pm Pacific Time, Plaintiff sent a text message to Defendant Lovrovich, in which Plaintiff stated: "Andrew [Defendant Lovrovich], need to speak soon. I agree with holding the Boeing 767 kit, but we can't just HOLD that and say nothing with nothing further until Dave [Defendant Richeson] and I arrive together, as Curtis [Mr. Griner] suggested, which might not be until 1:00 pm Pacific. Going to need to say something to Boeing, even if it's brief."

106. In response, at or about 6:23 pm Pacific time, Defendant Lovrovich responded to Plaintiff with a text message stating: "Okay sounds good – but would like to run it thru Curtis [Mr. Griner] in any case. If you [Plaintiff] want to give him [Mr. Griner] a ring before we talk that probably makes sense."

35

107. Thereafter, Plaintiff spoke with Mr. Griner over the telephone. Mr. Griner confirmed Defendants' direction to *hold* (not ship) finished product to Boeing.

108. Plaintiff explained to Mr. Griner that as a practical matter, upon withholding any product shipment, Boeing would realize this, because there were frequent and ongoing communications in the ordinary course between ASTECH employees and Boeing with respect to "line of balance" reporting (rate of production), operational issues, engineering issues, and shipping pickup and delivery status. Therefore, to withhold the product, as Defendants had directed Plaintiff to do, it was necessary to provide at least some minimal communication to Boeing in order to avoid widespread confusions at ASTECH, as well as at Boeing, as to whether or not product was being shipped. Mr. Griner agreed.

109. Plaintiff also asked Mr. Griner for Defendants' direction about ongoing manufacturing. Plaintiff explained to Mr. Griner that upon issuing a directive to withhold shipment of the product, it was also necessary to clarify if manufacturing should continue or stop. There were frequent and ongoing communications in the ordinary course between ASTECH employees and Boeing with respect to "line of balance" reporting (rate of production), operational issues, engineering issues, and shipping pickup and delivery status. Therefore, it was necessary to provide at least some minimal communication to Boeing in order to avoid widespread confusion at ASTECH, as well as at Boeing, whether or not manufacturing was stopped.

110. In response, Mr. Griner directed that Plaintiff should communicate to Boeing that ASTECH was stopping *both* manufacturing and shipping product until the issues identified in the demand letter to Boeing could be resolved.

36

111. Based on the direction above from Mr. Griner, Plaintiff wrote an initial draft communication to Boeing and emailed the text to Mr. Griner for review and approval to notify Boeing that ASTECH was implementing a ship hold and manufacturing shutdown.

112. Mr. Griner reviewed the draft and directed Plaintiff to make various edits, including: (a) to remove reference to "our counsel advises," even though Mr. Griner was personally involved, (b) to change the phrase "has *stopped* all" to "has *paused* all" in order to soften the language, and (c) to change "we are available for a supplier review" to "we are open to schedule a call." Plaintiff made *all* revisions exactly as directed Mr. Griner, and sent the final text back to Mr. Griner via email for a final review. Mr. Griner approved the final draft and, on behalf of Defendants, directed Plaintiff to send it Boeing.

113. Thereafter, on May 23, 2022 at or about 6:59 am Pacific time, Plaintiff sent an email response to Mr. Johan Cannon, and copied all of the same Boeing executives that Mr. Cannon had copied on his correspondence from Boeing and copied Defendant Richeson and Mr. Precht (ASTECH Programs Manager) notifying Boeing that that ASTECH "has paused all manufacturing and shipping."

114. Plaintiff did not add Mr. Griner and Defendant Lovrovich on copy in the above-referenced May 23, 2022 email for two reasons: First, Mr. Cannon had not included them in his email to provide Boeing's letter to ASTECH. Second, Defendants had wanted to downplay defendant Ten Oaks' involvement in the management of ASTECH, since Mr. Griner had expressly directed Plaintiff to remove the phrase "our counsel advises" from the first draft of the notice in order to conceal Mr. Griner's personal involvement.

115. As a direct result, there were clear manifest damages to Boeing and others, because the production shutdown exacerbated schedule delays (ongoing non-performance to

37

accepted purchase order due dates) and product quality issues causing harm to the Boeing Production System. As a result, Boeing swiftly requested that Defendants and ASTECH management meet with Boeing in-person in Everett, Washington on May 25, 2022.

116. Prior to the meeting, Defendants proposed various responses, approaches, and positions via calls, emails, and other written notes with numerous ambiguities and inconsistencies that Plaintiff sought to resolve prior to the meeting.

117. Accordingly, as CEO, Plaintiff took initiative to organize a meeting so that Defendants could provide definitive guidance to Plaintiff, Mr. Gulyas, and Mr. Precht, all of whom would be attending the Boeing meeting in person, together with Defendant Lovrovich and Defendant Richeson (who would appear by video conference). Plaintiff believed that the best way to resolve conflicting direction was to hold a meeting in person immediately prior to the Boeing meeting to receive Defendants' final instructions on how to proceed.

118. As such, Plaintiff organized a meeting among Plaintiff, Defendant Lovrovich, Mr. Gulyas, and Mr. Precht, at Panera Bread, 304 SE Everett Mall Way, Everett, Washington 98208, immediately prior to the meeting with Boeing for the specific purpose to clarify Defendants' strategy for the meeting, review information, discuss speaking roles, and related matters.

119. Defendant Lovrovich directed that he would address all pre-transaction questions and emphasize Defendant's intent to build "a partnership with Boeing." It was further directed by Defendant Lovrovich that Mr. Precht would discuss meeting topics related to invoices and payments, that Mr. Gulyas would discuss meeting topics related to manufacturing operations and engineering, and that Plaintiff would discuss any other commercial, operational, or contracting topics that might arise.

38

## C. Plaintiff Refuses to Join Defendants in Misrepresenting Facts at the May 25, 2022 Meeting with Boeing

120. On May 25, 2022, Defendants and/or their authorized agents and Plaintiff, among others, met together with leaders from Boeing in Everett, Washington, during which Defendants made numerous intentional material misrepresentations and omissions to Boeing, which Plaintiff had an objectively reasonable belief were a breach of contract, a fraud, and possibly a criminal fraud.

121. Specifically, the following individuals attended the May 25, 2022 meeting with Boeing (there may have been others that Plaintiff does not specifically recall at this point):

a. Defendant Andrew P. Lovrovich;

b. Defendant David P. Richeson (via video conference);

c. Plaintiff;

d. Mr. Scott Gulyas (ASTECH COO);

e. Mr. David Precht (ASTECH Program Manager);

f. Ms. Janene Collins (Boeing VP of Contracts & Sourcing, Commercial Aviation);

g. Mr. Cory Gionet (Boeing VP of Supplier Management);

h. Ms. Barbara Zetterberg (Boeing Director of Contracts);

i. Ms. Kathyrn Michlitsch (Boeing, Procurement Manager);

j. Mr. Rodney Armstrong (Boeing Director of Finance); and

k. Mr. Jonah Cannon (Boeing Procurement Agent)

122. The May 25, 2022 meeting began with Ms. Michlitsch presenting charts of monthly trailing 12-month data on ASTECH's purchase order delivery and quality commitments, showing that ASTECH remained behind schedule on purchase order due dates and had significant quality issues.

39

123. Mr. Gulyas responded by reminding the meeting participants that (a) ASTECH had improved in both schedule and quality during the last full month of April 2022, as compared to the prior month of March 2022 and as compared to other prior months on the charts presented by Ms. Michlitsch and (b) the data as presented by Ms. Michlitsch was monthly trailing 12-month data that would not reflect the recent improvement that occurred in April 2022 (which was Plaintiff's first month as CEO). Mr. Gulyas explained that it would take longer for recent improvement to be discernable in monthly trailing 12-month data.

124. Thereafter, Ms. Zetterberg and Mr. Gionet shifted the discussion to question defendants Lovrovich and Richeson, as agents of defendant Ten Oaks, with whom they had met previously in February 2022 or March 2022. Ms. Zetterberg explained to everyone in the conference room that when Defendant Lovrovich and Defendant Richeson had last met with Boeing, less than three months prior, that they had made material representations to Boeing that Boeing had relied upon when giving its written consent to approve the corporate carve-out agreement requested by Ten Oaks to acquire ASTECH. Thereafter, Ms. Zetterberg and other Boeing representatives raised questions and had discussions with defendants Lovrovich and Richeson about the issues identified below.

> **a. Defendants Falsely Told Boeing Ten Oaks Had Invested and Would Continue Invest In ASTECH, Which Was Untrue Because Ten Oaks Actually Had Received $7 Million to Take ASTECH and Had No Plans To Invest**

125. Ms. Zetterberg and Mr. Gionet explained that significant damages were ongoing as a result of the ASTECH's schedule delays and product quality issues, and these damages had been exacerbated by the ASTECH's sudden shipment hold and manufacturing shutdown.

126. Ms. Zetterberg asked how it was possible that Ten Oaks had invested in ASTECH with a guiding principle "to minimize customer disruption," referring to the February 2022

40

meeting document that Ten Oaks had presented to Boeing, and yet ASTECH sent Boeing a demand letter, stating affordability concerns and demanding price increases under the threat of a manufacturing shutdown. Ms. Zetterberg and Mr. Gionet expressed concern in receiving the demand letter, particularly where it claimed that ASTECH needed price support to continue to serve contracts with exactly the same pricing that Ten Oaks had reviewed and requested that ASTECH be allowed to assume when Ten Oaks acquired ASTECH. Ms. Zetterberg questioned Defendants' commitment to Ten Oaks' monetary investment in ASTECH.

127. In response to the concerns and questions raised by Boeing, Defendant Lovrovich replied, "we have and we will continue to invest." Thereafter, Defendant Lovrovich paused and looked at Plaintiff, who was seated at the conference room table beside Defendant Lovrovich, nodded his head, and motioned Plaintiff to speak. This was in plain view of everyone in the conference room, except Defendant Richeson attending the meeting via video conference.

128. However, Plaintiff refused to support the obvious lie that Defendant Lovrovich had just repeated to Boeing. Instead, Plaintiff remained silent. Plaintiff was well aware that Defendant Lovrovich had explained previously to him that Melrose (GKN) had *paid* Ten Oaks, through ASTECH, a payment of about $7 million for Ten Oaks to acquire ASTECH in a "pay-to-take" deal and that none of the Defendants, expressly including Ten Oaks, had made any investment of their own money in ASTECH and had expressly stated to Plaintiff that they had no intension of doing so. As such, it was obvious to Plaintiff that (a) Defendants had previously misled Boeing to induce Boeing to approve of Ten Oaks' acquisition of ASTECH; and (b) Defendant Lovrovich, as an agent of Defendants, had just again intentionally mislead Boeing, and he was trying to get Plaintiff's support in advancing the misrepresentations.

41

129.    During the discussion that followed, Mr. Gionet noted to Defendant Lovrovich that Defendants' conduct toward Boeing flowed down the supply chain to harm the U.S. Government which had contracted with Boeing to purchase and maintain the Boeing 767 tanker aircraft operated by the U.S. Air Force. Mr. Gionet explained that Defendants' intentional actions to harm the Boeing Production System would also be considered intentional acts to harm U.S. national security interests.

130.    Based on the totality of the information and circumstances, Plaintiff held an objectively reasonable belief that Defendants were engaged, at the various least, in a breach of contract and a civil fraud (and possibly a criminal fraud, given Mr. Gionet's comments) against Boeing, to which Plaintiff did not want to participate. Accordingly, Plaintiff refused to support the misrepresentations advanced by Defendants, and specifically through Defendant Lovrovich.

131.    Defendants' misrepresentations had caused and were causing harm to Boeing and Plaintiff refused to participate in causing such harm.  First, Boeing had already stated during the meeting that it had relied upon the representations of Ten Oaks' commitment to invest in ASTECH and commitment to obtain financing in order for Boeing to give its written consent to approve the Ten Oaks business plan and resulting corporate carve-out agreement allowing Ten Oaks to acquire ASTECH.  Obviously, if Boeing had known that Ten Oaks was making no monetary investment in ASTECH and would *not* apply for any financing at all for ASTECH, then Boeing certainly would *not* have approved of the change of control transaction (and Ten Oaks, through ASTECH, would not have received $7 million to take the business, its assets, and assume certain liabilities and all of its customer contracts).  However, because Boeing was misled into agreeing to the transaction, Ten Oaks, through ASTECH, was able to get paid by Melrose, acting through GKN. With $0 investment from Ten Oaks and $0 financing, ASTECH

42

was starved, and this caused a serious liquidity that impaired its ability to service Boeing and other customers per existing contracts.

132. As a result of its intentional deceit and fraud, Defendants created an extraordinarily high-risk business situation – a turnaround to be attempted with no contributing monetary investment from the company's new owners – to which Boeing would never have given its consent, given that the former owner, Melrose (GKN), was a large company with financial resources to sustain ASTECH.

133. Based on the totality of the information and circumstances, Plaintiff justifiably believed that Defendants had engaged in unlawful and even potentially criminal conduct in deceiving Boeing and that Plaintiff's refusal to be part of the unlawful conduct was justified and a protected activity.

   **b. Defendants Misrepresented to Boeing That ASTECH Would Apply For Financing**

134. As the May 25, 2022 meeting continued, Ms. Zetterberg and Mr. Gionet reminded Defendant Lovrovich and Defendant Richeson that before Ten Oaks acquired ASTECH, Ten oaks had made material representations that Ten Oaks would obtain financing for ASTECH through an asset-backed loan estimated up to $18 million. Defendant Lovrovich replied "we are" and then Defendant Lovrovich sought to change the topic to discuss what he called a "partnership with Boeing."

135. Based on Ms. Zetterberg's and Mr. Gionet's questioning and Mr. Lovrovich's answers, Plaintiff became certain that Defendants, including Defendant Lovrovich, were engaged in unethical and unlawful conduct, knowingly making false statements and omissions to mislead Boeing about the status of the ASTECH's financing.

43

136. Plaintiff knew from prior conversations with Defendants that they and Defendant Lovrovich knew ASTECH had not applied for financing and had no plans to do so, because Defendants had already directed Plaintiff and Mr. Adams to obtain an appraisal but not apply for financing because Defendants had no intention of do so. Defendants had previously stated to Plaintiff and others that they refused to pursue financing so they could avoid a lender's lien on ASTECH's fixed assets in order that Defendant could access the value of the fixed assets to pay costs to liquidate or reorganize the company.

137. Plaintiff held an objectively reasonable belief that Defendants were engaged in a breach of contract and civil fraud against Boeing and possibly a criminal fraud involving a U.S. government contractor, and Plaintiff would not support the ethical and unlawful conduct. Plaintiff declined to support Defendants' misrepresentations to Boeing at the May 25, 2022 meeting.

        **c.**     **Defendants Misled Boeing On Risks Related To ASTECH's Lease Renewal**

138. As the meeting on May 25, 2022 continued, Ms. Zetterberg and Mr. Gionet also reminded defendants Lovrovich and Richeson that Defendants had made material representations that Ten Oaks would extend the facility lease and reminded Defendants that Boeing had relied in good faith on many material representations about the lease status and prospects of ASTECH's facility lease renewal when they had given their written approval to the corporate carve-out agreement. Defendant Lovrovich replied, "yes, we are doing that" and again Defendant Lovrovich sought to change the topic to discuss what he called a "partnership with Boeing."

139. Again, Plaintiff knew that Defendant Lovrovich had knowingly made a material misrepresentation and omission to Boeing about the status of the lease and that damages were resulting. Defendants, including Defendant Lovrovich knew, and they intentionally did not

44

disclose to Boeing even after being asked about it, that the Landlord had indicated to ASTECH that they would not renew the facility lease *under its current terms* though they were open to *further discussion*. Defendants knew this status, because Plaintiff had previously explained this to Defendant Lovrovich previously. In fact, Defendants, through Mr. Griner, had sent an email acknowledging receipt of emails confirming Melrose (GKN) had not exercised its lease extension option, as Defendants and Melrose (GKN) had expressly agreed as a condition of the transaction.

140. Plaintiff knew the misrepresentation and omission had caused damages to Boeing to the extent it had not been disclosed previously to Boeing and was now causing further damages to Boeing because it was not being discussed again. The damages arise to Boeing because only Melrose (GKN) was able to extend the lease term, whereas Ten Oaks did not have that contract option. As such, time had passed and ASTECH was inside the long lead time (one year or more) that is often required to relocate complex manufacturing activities from one plant location to another plant location without disruption to manufacturing schedule (accepted purchase orders) and product quality. Even if a relocation were possible, it would now occur with *higher* risk and *higher* cost due to the expedited timeframe. Accordingly, Defendants likely would <u>not</u> pay the relocation costs and would force a liquidation and/or reorganization of the company, leaving Boeing and other customers that depend on the unique parts made by ASTECH to bailout the company at an extraordinary cost. Given that Boeing was sensitive to the risks to the lease renewal and apparently had asked before and was asking again now, Defendants deceit was particularly egregious.

141. Plaintiff held an objectively reasonable belief that Defendants were engaged in a breach of contract and civil fraud against Boeing and possibly a criminal fraud involving a U.S.

45

government contractor, and Plaintiff would not support the ethical and unlawful conduct. Plaintiff declined to support Defendants' misrepresentations to Boeing at the May 25, 2022 meeting.

        **d.     Defendants Deceived Boeing About Ten Oaks' Planned Short Holding Period**

142.    As the May 25, 2022 meeting continued, Ms. Zetterberg and Mr. Gionet reminded Defendants, and particularly defendants Lovrovich and Richeson, that they had made material representations that Ten Oaks did not engaged in quick resale or rapid liquidation of businesses like some traditional private equity investment firms. Defendant Lovrovich replied, "we have no plans to sell ASTECH", and "we don't do that," referring to liquidation and again he sought to discuss a "partnership with Boeing."

143.    However, as alleged previously, Defendant Lovrovich had previously explained to Plaintiff that several of Ten Oaks' portfolio companies had been quick flips and that Ten Oaks did not keep portfolio companies for longer holding periods, because they sought to complete separation activities and resell within about 18-24 months.

144.    Similarly, Defendant Richeson had previously revealed to Plaintiff that Ten Oaks desired to hold ASTECH for as short a time as possible with Defendants expecting to hold it in the range of 9-12 months and had "no interest" in holding ASTECH for longer.

145.    Defendant Richeson, who served as an Operating Partner for Ten Oaks and as Chairman of the Board of ASTECH, received no cash compensation for his work. He was focused on the potential equity compensation he could receive for reselling ASTECH.

146.    As such, Plaintiff knew that Defendants had misled Boeing about its anticipated holding period before and were clearly misleading Boeing about their anticipated holding period

46

again. Defendants knew that Boeing never would have given its approval to the corporate carve-out agreement to a party that was intending to quickly resell the company.

147. Accordingly, Defendants concealed and misled their true intensions to resell ASTECH from Boeing in order to trick Boeing into approval of Ten Oaks' acquisition of ASTECH, whereas Ten Oaks had represented to Plaintiff and others that they would resell the company as soon as they could in order to profit from doing so.

148. Plaintiff held an objectively reasonable belief that Defendants were engaged in a breach of contract and civil fraud against Boeing and possibly a criminal fraud involving a U.S. government contractor, and Plaintiff would not support the ethical and unlawful conduct. Plaintiff declined to support Defendants' misrepresentations to Boeing at the May 25, 2022 meeting.

> e. **Defendants Deceived Boeing About Ten Oaks' Management Fee Charged Retroactively**

149. Also at the May 25, 2022 meeting, Ms. Collins questioned Defendant Lovrovich as to whether Ten Oaks charged ASTECH a management fee, which is typically leveed by private equity investment firms on their portfolio companies and sometimes charged excessively as a mechanism for extracting value from portfolio companies. Defendant Lovrovich replied, "we do not charge a fee.  We do not accrue a fee.  There is no fee." Defendant Lovrovich's response was objectively intended to cause Boeing to believe that Ten Oaks does *not* charge its portfolio companies, including ASTECH, a management fee.

150. However, Defendant Lovrovich misled Boeing.  Defendant Lovrovich intentionally did not explain to Boeing what he had previously revealed to Plaintiff, which is that it is Ten Oaks' practice, which it planned to do with ASTECH, to *retroactively* charge its management fee at a later time but to keep it off the books initially.  Defendant Lovrovich had

explained previously to Plaintiff that Ten Oaks does not have audited financial statements and without audited financial statements Ten Oaks can avoid the formality of an accrual of its management fee in the financial statements but later collect the management fee in full retroactively. As such, Defendant Lovrovich's representations and omissions to Boeing were intended to deceive Boeing about the Ten Oaks management fee.

151. It was objectively apparent to Plaintiff and Defendants that Ms. Collins was trying to understand the management company fee arrangement, and Defendant Lovrovich's answer was intended to deceive her because he omitted the crucial fact that Ten Oaks *does* charge a management fee, but that they do so *retroactively*.

152. Plaintiff held an objectively reasonable belief that Defendants were engaged in a breach of contract and civil fraud against Boeing and possibly a criminal fraud involving a U.S. government contractor, and Plaintiff would not support the ethical and unlawful conduct. Plaintiff declined to support Defendants' misrepresentations to Boeing at the May 25, 2022 meeting.

### f. Defendants Misrepresented the Relevance of Defendant Lovrovich's Experience

153. As the meeting on May 25, 2022 continued, Ms. Collins also questioned Defendant Lovrovich as to representations that he had made to Boeing regarding the relevance of his experience and Defendants' business experience to lead ASTECH effectively.

154. In response, Defendant Lovrovich did not reveal the truth, which is that he was new to his role at Ten Oaks having been hired in March 2021 (less than 16 months at defendant Ten Oaks) and that prior to Ten Oaks he had no experience outside of consulting firms, in-house consulting for private equity, and one Chief Operating Officer role incident to his work in private equity. Mr. Lovrovich had no prior industry experience in aerospace and defense, and he never

48

held any senior role (*i.e.*, Chief Executive Officer, President, or General Manager, etc.) of any business in any industry. Defendant Lovrovich did <u>not</u> have *relevant* experience to lead ASTECH effectively.

155. Defendant Lovrovich is a career consultant. Prior to Ten Oaks, defendant. Lovrovich was an in-house consultant (with the title "Operating Partner" or "Portfolio Operations Executive") for portfolio companies of Summit Park, a private equity firm. At Summit Park, Defendant Lovrovich held only one management role as a Chief Operating Officer, but that was incident to his role as in-house consultant at Summit Park. Prior to Summit Park, Defendant Lovrovich was a consultant for West Monroe Partners, a national management and technology consulting firm. Prior to West Monroe Partners, Defendant Lovrovich was an in-house consultant for IBM. Prior to IBM, Defendant Lovrovich graduated with a bachelor's degree from Carnegie Melon University in 2011. Defendant Lovrovich knew future Ten Oaks co-founder, Mr. Hahn, from their shared experience as undergraduate degree students in fraternities at Carnegie Melon University, and Defendant Lovrovich knew future Ten Oaks co-founder, Mr. Magan, from their work together at Summit Park. As such, Defendant Lovrovich obtained his position at Ten Oaks due to his relationships with and loyalty to the co-founders of Ten Oaks and <u>not</u> due to his business experience.

156. Plaintiff held an objectively reasonable belief that Defendants were engaged in a breach of contract and civil fraud against Boeing and possibly a criminal fraud involving a U.S. government contractor, and Plaintiff would not support the ethical and unlawful conduct. Plaintiff declined to support Defendants' misrepresentations to Boeing at the May 25, 2022 meeting.

49

**D.** **Defendants Retaliated Against Plaintiff for Complaining about and Refusing to Support or Participate in Misrepresentations, Deceit and Unlawful Conduct**

157. After the May 25, 2022 meeting with Boeing initially concluded, Defendant Lovrovich and Plaintiff waited together in a group with Mr. Gulyas and Mr. Precht in the reception area while Boeing worked on a letter summarizing the meeting and next steps.

158. During that waiting time, Defendant Lovrovich declined to speak or interact with Plaintiff and was clearly frustrated and enraged at Plaintiff as a result of Plaintiff's refusal to support and echo the misrepresentations made by Defendants during the meeting with Boeing. Plaintiff did not actively refute the misrepresentations in front of Boeing, but Plaintiff had refused to echo and support them even when pressured to do so during the meeting by Defendants through Defendant Lovrovich.

159. As a result of the meeting with Boeing and in reliance on all the misrepresentations Defendants made to Boeing previously and again during the May 25, 2022 meeting, Boeing agreed to entertain price increase discussions, on the condition that that ASTECH resume manufacturing and shipping product to Boeing and that ASTECH could catch up on purchase order due dates and resolve product quality issues, among other things, and maintain shipments on-time for 90 days. Boeing memorialized its commitment in a one-page letter addressed to Plaintiff in his capacity as Chief Executive Officer.

160. After receiving the one-page letter summary from Boeing, Defendant Lovrovich, Plaintiff, Mr. Gulyas, and Mr. Precht departed. Plaintiff flew back to Orange County, California where Plaintiff resided through the workweek.

161. The following day, on May 26, 2022, at or about 9:39 am Pacific time, while Plaintiff was working in California, Defendant Richeson texted Plaintiff and sent a calendar

invite for Plaintiff to call him at 12:00 pm Pacific time. Plaintiff called Defendant Richeson at the appointed time.

162. Upon answering the call, Defendant Richeson began by stating: "Jack, I have spoken to Andrew [Defendant Lovrovich], and we are very disappointed with the meeting yesterday. Jack, you really threw Andrew under the bus!" Plaintiff asked for explanation. Defendant Richeson criticized Plaintiff for remaining silent and not backing up Defendant Lovrovich's responses to Boeing's questions at the previous day's meeting about Ten Oaks' investment, financing, lease renewal, and management fees.

163. Defendant Richeson further stated that it was "unacceptable" that Plaintiff was unwilling to support the statements that Defendants had made to Boeing. Defendant Richeson further expressed his belief that it made Defendants look bad that Defendants had to be the ones to respond to queries from Boeing about Defendants' prior representations and that they needed Plaintiff, as CEO, to be on board with the story.

164. At this point, Plaintiff stated to Defendant Richeson: "As CEO, I will not condone or support obvious misrepresentations to Boeing. It's unethical, and it's illegal. I will not echo statements to Boeing that are contrary to what you, Andrew [Defendant Lovrovich], and others have previously told me. Doing so is false and misleading to Boeing."

165. Defendant Richeson became incensed at Plaintiff's steadfast position that he would not engage in deception to customers and/or what Plaintiff objectively believed to be unlawful or unethical conduct. Defendant Richeson then stated: "Jack, look, after speaking with Andrew, I am going to take more of an executive chairman role and get more involved in all the meetings and you are going to take direction from me."

51

166. Plaintiff perceived that Defendants were retaliating against him for his refusal to condone or be supportive of Defendants' obvious misrepresentations to Boeing at the previous day's meeting and Plaintiff feared that the retaliation might result in Plaintiff's termination by Defendants. Thereafter, Plaintiff attempted to reach Defendant Lovrovich by phone and email to complain about the obvious retaliation he was suffering for not participating in the unlawful and unethical conduct, but Defendant Lovrovich would not communicate with him.

167. On May 26, 2022 at or about 1:52 pm Pacific time, Plaintiff sent a text message to Defendant Lovrovich, in which Plaintiff stated: "Andrew, tried to reach you, can you let me know when you are avail or call me back."

168. Thereafter, Plaintiff met with Mr. Gulyas at or about 2:00 pm Pacific time to notify him that Defendant Richeson had informed Plaintiff that Defendant Richeson intended to join the weekly SIOP (Sales, Inventory & Operations Planning) meeting that would be reconvening (continuing) later that afternoon. Plaintiff explained to Mr. Gulyas that Defendant Richeson had told Plaintiff that Defendants were upset about the Boeing meeting and, as a result, Defendants were putting pressure on Plaintiff, so Defendant Richeson would be joining the SIOP meeting and all other meetings normally led by Plaintiff.

169. Later that same day, March 26, 2022, at or about 2:35 pm Pacific time, in California, Plaintiff reconvened the weekly SIOP (Sales, Inventory & Operations Planning) meeting among Plaintiff and senior managers, including Mr. Gulyas, Mr. Adams, Mr. Precht, Mr. Benson (Director of Operations), Mr. Hall (Supply Chain Manager), and others. Defendant Richeson did not join the meeting at the start time as expected.

170. However, part way through the meeting, Defendant Richeson joined the meeting by video conference, while Plaintiff and all other meeting participants were in California. Rather

52

than listening to the discussion, Defendant Richeson interrupted the meeting several times that took the meeting off topic (critical path), which undermined Plaintiff who was leading the meeting. After a time, Defendant Richeson left the meeting early (missing the discussion and conclusions at the end). As such, it was obvious to Plaintiff that Defendant Richeson was not interested in contributing and had joined the meeting only to undermine Plaintiff in retaliation for Plaintiff's refusal to condone or be supportive of Defendant's obvious misrepresentations to Boeing at the previous day's meeting.

171. At or about 3:25 pm Pacific time, Defendant Lovrovich replied via text message, stating: "I'm tied up on calls all day but will call you [Plaintiff] later on when I free up."

172. Later, Defendant Lovrovich sent another text message on March 26, 2022 around 4:48 pm Pacific time via text message, stating: "Saw your email - I caught up with Dave [Defendant Richeson] and am up to speed. Can chat tomorrow."

173. Defendant Lovrovich would not speak privately with Plaintiff on March 26, 2022, since Defendants, through Defendant Lovrovich and Defendant Richeson, were moving to terminate Plaintiff in retaliation for Plaintiff's refusal to condone or be supportive of Defendants' obvious misrepresentations to Boeing at the previous day's meeting.

174. The following day, on May 27, 2022, Plaintiff received a text message from Defendant Richeson indicating that both Defendant Richeson and Defendant Lovrovich wanted to speak with Plaintiff. When Plaintiff joined the video conference call, Defendants communicated to him that Defendants had terminated him from all roles, effectively immediately. No stated reason was given, but the reason was obvious. Less than 48 hours had transpired since Plaintiff had refused to condone and support the misrepresentations, fraud and unethical conduct Defendants had perpetrated at the Boeing meeting.

53

175. Accordingly, Defendants retaliated against and terminated Plaintiff because Plaintiff had complained about and would not support Defendants' unlawful and unethical conduct.

**FIRST CAUSE OF ACTION**
**(Fraudulent Inducement)**
**(Against All Defendants)**

176. Plaintiff hereby incorporates the preceding paragraphs of this Complaint as though fully set forth herein.

177. As detailed above, Defendants made false representations to Plaintiff, including but not limited to statements that Ten Oaks had invested its own money to acquire ASTECH, that Ten Oaks would invest additional money in ASTECH, and that Defendants would obtain financing for ASTECH. The above detailed statements were false, Defendants knew them to be false at the time Defendants made them (or acted with reckless disregard for the truth), and Defendants intended Plaintiff to rely on them to accept work for Defendants and turn down other opportunities.

178. Plaintiff did, in fact, justifiably rely on Defendants' misrepresentations, false promises, suppression, and acts of deceit in agreeing to perform work for Defendants.

179. Plaintiff's justifiable reliance on Defendants' misrepresentations, false promises, suppression, and acts of deceit was a substantial factor in proximately causing harm to Plaintiff, in that Plaintiff turned down alternative work at a higher salary based on the mistaken belief that the work offered by Defendants was superior.

180. As a direct, foreseeable, and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered and will continue to suffer damages, including but not limited to lost earnings and other employment benefits, loss of employment-related opportunities

54

(including but not limited to experience in the position Plaintiff held and advancement opportunities), and emotional distress. The amount of damages will be proved at the time of trial, but is no less than $75,000.01 plus any interest, costs, disbursements, and attorney's fees to which Plaintiff is entitled under applicable law.

181. In doing the things herein alleged, the acts and conduct of Defendants, and each of them, constituted "malice," "oppression," and/or "fraud" in that these acts were intended by Defendants to cause injury to Plaintiff and/or constituted despicable conduct carried on by Defendants with willful and conscious disregard of the rights of Plaintiff, with the intention of the Defendants to deprive Plaintiff of property and legal rights, and were authorized or approved by Defendants justifying an award of exemplary and punitive damages in an amount according to proof, in order to deter Defendants from similar conduct in the future.

**SECOND CAUSE OF ACTION**
**(Negligent Misrepresentation)**
**(Against All Defendants)**

182. Plaintiff hereby incorporates the preceding paragraphs of this Complaint as though fully set forth herein.

183. As detailed above, Defendants made false representations to Plaintiff, including but not limited to statements that Ten Oaks had invested its own money to acquire ASTECH, that Ten Oaks would invest additional money in ASTECH, and that Defendants would obtain financing for ASTECH.

184. Defendants had no reasonable grounds for believing that the aforementioned statements were true and they were, in fact, false.

185. Defendants intended Plaintiff to rely on the aforementioned statements to accept work for Defendants and turn down other opportunities.

55

186. Plaintiff did, in fact, justifiably rely on the aforementioned false statements in agreeing to perform work for Defendants and foregoing alternative employment.

187. Plaintiff's justifiable reliance on Defendants' false statements was a substantial factor in proximately causing harm to Plaintiff, in that Plaintiff turned down alternative work at a higher salary based on the mistaken belief that the work offered by Defendants was superior.

188. As a direct, foreseeable, and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered and will continue to suffer damages, including but not limited to lost earnings and other employment benefits, loss of employment-related opportunities (including but not limited to experience in the position Plaintiff held and advancement opportunities), and emotional distress. The amount of damages will be proved at the time of trial, but is no less than $75,000.01 plus any interest, costs, disbursements, and attorney's fees to which Plaintiff is entitled under applicable law.

### THIRD CAUSE OF ACTION
### (Wrongful Termination in Violation of California Public Policy – Tameny Claim)
### (Against All Defendants)

189. Plaintiff hereby incorporates the preceding paragraphs of this Complaint as though fully set forth herein.

190. It is a fundamental California public policy that companies not engage in unfair or unlawful business practices, such as fraud, deceit or other such conduct or retaliate against employees for raising unlawful conduct or other statutory violations. *See* Bus. & Prof. Code § 17200 et. seq., Civ. Code § 1709; Gov. Code § 12653.; Labor Code § 1102.5; Labor Code 232.5; Penal Code § 487. "[W]hen an employer discharges an employee who refuses to defraud the customer, the employer has violated a fundamental public policy and may be liable in tort for

56

wrongful discharge." *See Haney v. Aramark Uniform Services, Inc.*, 121 Cal.App.4th 623, 643 (2004)

191. Plaintiff's employment was wrongfully terminated by Defendants because of Plaintiff's refusal to condone, support and participate in fraud, deceit and misrepresentations to ASTECH's customers, namely Boeing, and Plaintiff's push back on Defendants' unlawful and illegal scheme to defraud Boeing.

192. Within hours of Plaintiff complaining to Defendant Richeson about the events at the Boeing meeting, Defendants terminated Plaintiff.

193. As a direct, foreseeable, and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered and will continue to suffer damages, including but not limited to lost earnings and other employment benefits, loss of employment-related opportunities (including but not limited to experience in the position Plaintiff held and advancement opportunities), and emotional distress. The amount of damages will be proved at the time of trial, but is no less than $75,000.01 plus any interest, costs, disbursements, and attorney's fees to which Plaintiff is entitled under applicable law.

194. In doing the things herein alleged, the acts and conduct of Defendants, and each of them, constituted "malice," "oppression," and/or "fraud" in that these acts were intended by Defendants to cause injury to Plaintiff and/or constituted despicable conduct carried on by Defendants with willful and conscious disregard of the rights of Plaintiff, with the intention of the Defendants to deprive Plaintiff of property and legal rights, and were authorized or approved by Defendants justifying an award of exemplary and punitive damages in an amount according to proof, in order to deter Defendants from similar conduct in the future.

**FOURTH CAUSE OF ACTION**
**(Unlawful Retaliation – Cal. Labor Code § 1102.5)**

57

**(Against all Defendants)**

195.   Plaintiff hereby incorporates the preceding paragraphs of this Complaint as though fully set forth herein.

196.   California Labor Code § 1102.5(b) makes it unlawful for an "employer, or any person acting on behalf of an employer" to retaliate against an employee for disclosing to "a person with authority over the employee or another employee who has the authority to investigate, discovery or correct" a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

197.   California Labor Code § 1102.5(c) makes it unlawful for an "employer, or any person acting on behalf of the employer," to retaliate against an employee "for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

198.   Plaintiff's employment was wrongfully terminated by Defendants because of Plaintiff's refusal to condone, support and participate in fraud, deceit and misrepresentations to ASTECH's customers, namely Boeing, and Plaintiff's push back on Defendants' unlawful and illegal scheme to defraud Boeing.

199.   Within hours of Plaintiff complaining to Defendant Richeson about the events at the Boeing meeting, Defendants terminated Plaintiff.

200.   As a direct, foreseeable, and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered and will continue to suffer damages, including but not limited to lost earnings and other employment benefits, loss of employment-related opportunities (including but not limited to experience in the position Plaintiff held and advancement opportunities), and emotional distress.  The amount of damages will be proved at the time of

58

trial, but is no less than $75,000.01 plus any interest, costs, disbursements, and attorney's fees to which Plaintiff is entitled under applicable law.

201. In doing the things herein alleged, the acts and conduct of Defendants, and each of them, constituted "malice," "oppression," and/or "fraud" in that these acts were intended by Defendants to cause injury to Plaintiff and/or constituted despicable conduct carried on by Defendants with willful and conscious disregard of the rights of Plaintiff, with the intention of the Defendants to deprive Plaintiff of property and legal rights, and were authorized or approved by Defendants justifying an award of exemplary and punitive damages in an amount according to proof, in order to deter Defendants from similar conduct in the future.

**FIFTH CAUSE OF ACTION**
**(Unlawful Retaliation – Cal. Labor Code § 98.6)**
**(Against all Defendants)**

202. Plaintiff hereby incorporates the preceding paragraphs of this Complaint as though fully set forth herein.

203. Pursuant to California Labor Code § 98.6, a person may not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee because the employee engaged in protected activities, including the exercise by the employee of any right afforded to him.

204. Plaintiff had the legal right not to engage in, condone, or support in any way what he believed to fraud, misrepresentations, unlawful and unethical conduct by Defendants, as previously described.

205. Within hours of Plaintiff refusing to engage in, condone, or support in any way what he believed to fraud, misrepresentations, unlawful and unethical conduct by Defendants, Defendants retaliated against and terminated Plaintiff.

59

206. As a direct, foreseeable, and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered and will continue to suffer damages, including but not limited to lost earnings and other employment benefits, loss of employment-related opportunities (including but not limited to experience in the position Plaintiff held and advancement opportunities), and emotional distress. The amount of damages will be proved at the time of trial, but is no less than $75,000.01 plus any interest, costs, disbursements, and attorney's fees to which Plaintiff is entitled under applicable law.

207. In doing the things herein alleged, the acts and conduct of Defendants, and each of them, constituted "malice," "oppression," and/or "fraud" in that these acts were intended by Defendants to cause injury to Plaintiff and/or constituted despicable conduct carried on by Defendants with willful and conscious disregard of the rights of Plaintiff, with the intention of the Defendants to deprive Plaintiff of property and legal rights, and were authorized or approved by Defendants justifying an award of exemplary and punitive damages in an amount according to proof, in order to deter Defendants from similar conduct in the future.

## SIXTH CAUSE OF ACTION
### (Unlawful Retaliation – Cal. Labor Code § 232.5)
### (Against all Defendants)

208. Plaintiff hereby incorporates the preceding paragraphs of this Complaint as though fully set forth herein.

209. Pursuant to California Labor Code § 232.5, an employer may not discharge, discipline, or in any manner discriminate, retaliate, or take any adverse action against any employee who discusses or discloses information about the employer's working conditions.

60

210. Pursuant to Labor Code § 232.5, Plaintiff had the legal right to complain to Defendant about being required to explicitly or implicitly condone, support, or approve of obvious misrepresentations to Boeing.

211. On May 26, 2022, while Plaintiff was working in California, Defendant Richeson texted Plaintiff directing Plaintiff to call him. Plaintiff promptly called Defendant Richeson. Upon answering the call, Defendant Richeson began by stating: "Jack, I have spoken to Andrew [Defendant Lovrovich], and we are very disappointed with the meeting yesterday. Jack, you really threw Andrew under the bus!" As Defendant Richeson and Plaintiff discussed the prior meeting at Boeing, Plaintiff indicated he was not comfortable supporting Defendants' statements to Boeing that Plaintiff knew were not true. Defendant Richeson then began criticizing Plaintiff for remaining silent and not helping Defendants lie to Boeing at the previous day's meeting. Defendant Richeson communicated that it was unacceptable that Plaintiff was unwilling to support the statements that Defendants had made to Boeing and that it made it look bad that Defendants had to be the ones to make the representations and that they needed Plaintiff, as CEO, to be on board with the story.

212. Plaintiff refused to condone or be supportive of obvious misrepresentations to Boeing and what Plaintiff believed to be contract violations and patently unlawful conduct. Plaintiff stated to Defendant Richeson that he could not echo statements to Boeing that were expressly contrary to what Defendants had previously told him and which Plaintiff believed "were false and misleading statements to Boeing."

213. Within hours of Plaintiff complaining to Defendant Richeson about being asked to engage in, condone, or support in any way what he believed to fraud, misrepresentations,

61

unlawful and unethical conduct by Defendants, Defendants retaliated against and terminated Plaintiff in violation of Labor Code § 232.5.

214. As a direct, foreseeable, and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered and will continue to suffer damages, including but not limited to lost earnings and other employment benefits, loss of employment-related opportunities (including but not limited to experience in the position Plaintiff held and advancement opportunities), and emotional distress. The amount of damages will be proved at the time of trial, but is no less than $75,000.01 plus any interest, costs, disbursements, and attorney's fees to which Plaintiff is entitled under applicable law.

215. In doing the things herein alleged, the acts and conduct of Defendants, and each of them, constituted "malice," "oppression," and/or "fraud" in that these acts were intended by Defendants to cause injury to Plaintiff and/or constituted despicable conduct carried on by Defendants with willful and conscious disregard of the rights of Plaintiff, with the intention of the Defendants to deprive Plaintiff of property and legal rights, and were authorized or approved by Defendants justifying an award of exemplary and punitive damages in an amount according to proof, in order to deter Defendants from similar conduct in the future.

**SEVENTH CAUSE OF ACTION**
**(Unlawful Retaliation – Va. Code § 40.1-27.3)**
**(Against all Defendants)**

216. Plaintiff hereby incorporates the preceding paragraphs of this Complaint as though fully set forth herein.

217. Virginia Code § 40.1.27.3(A)(3)-(4) makes it unlawful for an employer to retaliate against an employee for refusing to "engage in a criminal act that would subject the employee to criminal liability" or refusing "an employer's order to perform an action that

62

violates any federal or state law or regulation and the employee informs the employer that the order is being refused for that reason."

218. Plaintiff's employment was wrongfully terminated by Defendants because of Plaintiff's refusal to condone, support and participate in fraud, deceit and misrepresentations to ASTECH's customers, namely Boeing, and Plaintiff's push back on Defendants' unlawful and illegal scheme to defraud Boeing.

219. Within hours of Plaintiff complaining to Defendant Richeson about the events at the Boeing meeting, Defendants terminated Plaintiff.

220. As a direct, foreseeable, and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered and will continue to suffer damages, including but not limited to lost earnings and other employment benefits, loss of employment-related opportunities (including but not limited to experience in the position Plaintiff held and advancement opportunities), and emotional distress. The amount of damages will be proved at the time of trial, but is no less than $75,000.01 plus any interest, costs, disbursements, and attorney's fees to which Plaintiff is entitled under applicable law.

221. In doing the things herein alleged, the acts and conduct of Defendants, and each of them, constituted "malice," "oppression," and/or "fraud" in that these acts were intended by Defendants to cause injury to Plaintiff and/or constituted despicable conduct carried on by Defendants with willful and conscious disregard of the rights of Plaintiff, with the intention of the Defendants to deprive Plaintiff of property and legal rights, and were authorized or approved by Defendants justifying an award of exemplary and punitive damages in an amount according to proof, in order to deter Defendants from similar conduct in the future.

**JURY DEMAND**

63

Trial by jury is hereby demanded on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, as follows:

1. For damages according to proof, including but not limited to direct damages, special damages, back pay, front pay, emotional distress damages, and punitive damages; plus any interest, costs, disbursements, statutory penalties, and attorney's fees to which Plaintiff is entitled by law;

2. To enjoin Defendants from continuing the unlawful, unfair and/or deceptive practices described herein.

3. For such other and further relief as the Court may deem just and proper.

Dated: July 10, 2023

              __s/ Mark S. Pincus_____
              Jared E. Gardner (N.C. Bar No. 28275)
              Mark S. Pincus (N.C. Bar No. 59036)
              GARDNER SKELTON PLLC
              505 East Boulevard
              Charlotte, North Carolina 28203
              Telephone: (704) 335-0350
              Facsimile: (704) 390-7027
              jared@gardnerskelton.com
              mark@gardnerskelton.com
              *Attorneys for Plaintiff*